Submitted on the record May 9, 2000, complaint dismissed April 10, 2003

## In re Complaint as to the Conduct of

# MAGAR E. MAGAR,
*Accused.*

## (OSB 94-178, 94-210; SC S29172)

66 P3d 1014

Magar E. Magar, Portland, filed the briefs for himself.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Durham, and Riggs, Justices.*

PER CURIAM

▮

---

* Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; Leeson, J., resigned January 31, 2003, and did not participate in the decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

## PER CURIAM

This lawyer disciplinary proceeding involves two causes of complaint. In the first, the Oregon State Bar (Bar) alleged that the accused violated Code of Professional Responsibility Disciplinary Rule (DR) 7-102(A)(1) (knowingly asserting position to harass or maliciously injure another) and DR 7-102(A)(2) (knowingly advancing claim or defense unwarranted under existing law) while representing his clients, the Korgans, in bankruptcy and related matters. In the second, the Bar alleged that the accused violated DR 6-101(A) (incompetent representation) and DR 6-101(B) (neglect of legal matter) while representing his client, London, in a dissolution proceeding.

A trial panel of the Disciplinary Board determined that the accused had not violated DR 7-102(A)(1),[1] but had violated DR 7-102(A)(2), DR 6-101(A), and DR 6-101(B), and imposed a one-year suspension. This court's review is automatic and *de novo*. ORS 9.536(2) and (3); BR 10.1 and 10.6.

■ The Bar has the burden of establishing alleged misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). For the reasons that follow, we dismiss the complaint.

### KORGAN MATTER

In 1985, the accused filed a Chapter 13 bankruptcy proceeding for the Korgans, and the bankruptcy court confirmed a Chapter 13 plan.[2] Later, the Korgans purchased a house from the Walslebens. The purchase contract required the Korgans to pay the property taxes and provided that, if they failed to do so, such failure would constitute a default permitting the Walslebens to foreclose.

---

[1] The Bar did not seek review of the trial panel's determination that the Bar had failed to prove the allegations relating to the Korgan matter under DR 7-102(A)(1).

[2] Filing a Chapter 13 bankruptcy petition creates an estate that holds the debtor's assets. *See* 11 USC § 1306 (describing estate property). When the bankruptcy court confirms a Chapter 13 plan, however, the assets are revested in the debtor, unless the plan provides otherwise. 11 USC § 1327.

The Korgans became delinquent in their payment of property taxes on the house. In May 1990, the Walslebens' lawyer, Bassett, demanded that the Korgans pay the taxes. In response, the accused wrote a letter to Bassett in behalf of the Korgans, stating, in part:

"[T]he property is in no jeopardy of foreclosure by the taxing authorities because as you know foreclosure occurs when more than three years of taxes are delinquent and that further *the Korgans are in a chapter 13 bankruptcy a situation that would forestall any action by both your clients and the county.*"

(Emphasis added.) When the accused wrote that letter, he was aware of a bankruptcy opinion from the United States District Court for the District of Oregon that held, contrary to the accused's statement, that the bankruptcy estate ceases to exist after plan confirmation and, thus, the automatic stay that attaches upon the commencement of bankruptcy proceedings no longer applies as to the estate. *In re Mason*, 51 BR 548 (D Or 1985). The accused also was aware, however, that other federal bankruptcy cases had been critical of *Mason*.

Bassett reviewed the Korgans' bankruptcy court file and concluded that the stay did not apply to the property in question. The Walslebens then filed an action in state court against the Korgans seeking strict foreclosure. In response, the Korgans filed another Chapter 13 bankruptcy petition, which prevented the state court from entering a foreclosure decree. The Walslebens then moved for relief from the automatic stay imposed as part of the second Chapter 13 proceeding. The bankruptcy court granted the motion and entered an order lifting the stay as to the Walslebens' state foreclosure action. In 1991, the state court entered an interlocutory judgment of strict foreclosure in the Walslebens' favor, and, later that year, the Korgans were evicted from the property.

In the meantime, the accused, acting in the Korgans' behalf, filed an appeal from the bankruptcy court's order with the Ninth Circuit Bankruptcy Appellate Panel (BAP). In 1992, however, the Walslebens sold the property in question to Hill, a family friend of the Walslebens. The Walslebens then moved to dismiss the appeal as moot, in light of the sale

of the property to Hill. The accused countered that the sale was fraudulent and that it was calculated to provoke the BAP to dismiss the appeal. The BAP agreed with the Walslebens and dismissed the appeal. The accused then appealed that decision to the Ninth Circuit, which affirmed the BAP's dismissal.

In 1993, the Korgans filed an adversary proceeding for injunctive and declaratory relief against the Walslebens in bankruptcy court. That action sought to annul the sale of the property to Hill and to reinstate the bankruptcy stay. The complaint alleged that the sale was a sham transaction and, therefore, a fraud on the bankruptcy court. The Walslebens, however, successfully moved to dismiss the adversary proceeding. In particular, the bankruptcy court held that (1) the automatic stay, once lifted, could not be reinstated; (2) the accused's claims in the adversary proceeding were untimely under the applicable procedural rules; and (3) the bankruptcy trial court could not undo the effect of the BAP's dismissal of the appeal.

The Bar instituted disciplinary proceedings against the accused, alleging that he had filed various pleadings, motions, and appeals in state and federal court that had violated DR 7-102(A)(1) and DR 7-102(A)(2). After a hearing, the trial panel rejected the Bar's allegation that the accused had violated DR 7-102(A)(1), finding that the accused had been motivated to protect the Korgans' property, rather than to harass or maliciously injure Bassett or the Walslebens. The trial panel also concluded that the accused's litigation filings in the Korgans' behalf did not violate DR 7-102(A)(2):

> "[T]he Accused's conduct in carrying out the protracted litigation in the Walsleben matter both in state court and in the bankruptcy court, had some basis in existing law. The Bar's own witness * * * Snyder testified that the bankruptcy procedure through BAP and the 9th Circuit Court of Appeals was warranted. We find that the Accused's attempt to reinstate the stay [in the adversary proceeding] based upon fraud following denial by the 9th Circuit was theoretically warranted by existing law as an attack upon a judgment because of fraud on the court."

The trial panel, however, concluded that the accused had violated DR 7-102(A)(2) by stating in his letter to Bassett that the Korgans' property was protected from foreclosure by the automatic stay in the bankruptcy proceeding. The trial panel, citing *Mason*, concluded that "existing law held that the property was afforded no such protection."

■       DR 7-102(A)(2) provides that, in representing a client, a lawyer shall not

> "[k]nowingly advance a claim or defense that is unwarranted under existing law except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law."

The Bar argues that, under *Mason*, the accused's assertion in his letter to Bassett—that the automatic stay in the Korgans' bankruptcy proceeding protected the property—was unwarranted. In *Mason*, the issue was whether the automatic stay provided for in 11 USC section 362(a), which generally protects the property in a bankruptcy estate from creditors' claims, protects post-confirmation wages from garnishment to satisfy a post-confirmation debt. The court concluded that the stay did not apply to wages earned post-confirmation because the bankruptcy estate ceased to exist post-confirmation. The wages therefore could be garnished without violating the stay. 51 BR at 550. In other words, the post-confirmation wages belonged to the debtor, not to the estate that had been protected by the stay, and so those wages could be garnished. As the Bar contends, that holding is contrary to the position that the accused asserted in his letter to Bassett.

The accused, however, correctly maintains that several courts had rejected *Mason* before the accused wrote to Bassett. One case in particular concluded that *Mason* was "premised upon [a] mistaken belief" that confirmation was relevant to determining whether property was within the scope of the estate. *In re Aneiro*, 72 BR 424, 428-29 (Bankr SD Cal 1987); *accord In re Root*, 61 BR 984, 985 (Bankr D Colo 1986) ("strongly disagree[ing]" with *Mason*'s conclusion that confirmation of Chapter 13 plan vests all property of estate in debtor, rather than in estate).

Another, more detailed, opinion, *In re Schewe*, 94 BR 938 (Bankr WD Mich 1989), also disagreed with *Mason*, concluding that the automatic stay in a Chapter 13 proceeding protects a debtor's possessory interest in "residential real property both prior to and subsequent to confirmation of a Chapter 13 plan." 94 BR at 946. *Schewe* concluded that the "majority of the cases which hold the automatic stay does not apply in Chapter 13 cases postconfirmation involve alimony, maintenance[,] and support issues." *Id.* at 945. The court further asserted that such circumstances factually are different from circumstances in which a "debtor is a wage earner, [and] the continued further occupancy of his residential premises may be essential to earning his income and carrying out the terms of the debtor's confirmed plan." *Id.*

The cases cited above, each disagreeing with *Mason*, represented part of the existing law when the accused wrote the letter to Bassett. Those cases demonstrate that, at the time when the accused wrote to Bassett, *Mason* had not received universal acceptance among bankruptcy courts. That fact undercuts the Bar's allegation that the accused violated DR 7-102(A)(2), because "existing law" included the opinions of courts that disputed *Mason*'s legal conclusions.[3] Further, one of those cases, *Schewe*, stands as authority that real property should be treated as subject to the stay.

We conclude that the accused did not advance a claim or defense that was unwarranted under existing law and, therefore, did not violate DR 7-102(A)(2) when he made his assertions in the letter to Bassett.

The Bar also argues that the accused violated DR 7-102(A)(2) when he filed the adversary proceeding in bankruptcy court in 1993 after the Ninth Circuit dismissed his appeal. The complaint in the adversary proceeding was based

---

[3] The Bar assumes, without analysis, that *Mason* was binding authority in the District of Oregon for the broad proposition that the confirmation of a Chapter 13 bankruptcy plan terminates the automatic stay as to the property of the estate. That assumption is questionable. Some courts have held that, unless an entire federal district court binds itself to a decision by issuing that decision en banc, that decision merely is law of the case. *See, e.g., In re Bakarat*, 173 BR 672, 679 (Bankr CD Cal 1994) (so stating). *Mason* was not an en banc opinion, but represented the opinion of only one district court judge sitting in appellate review of a bankruptcy court decision.

upon the theory that the Walslebens had transferred the property to a straw man, Hill, to render moot any proceedings regarding that property. The accused testified that he "could not believe that there could be a bona fide sale of this property with so much litigation attached to it." In light of that litigation, the accused thought that it did not "make any financial sense for anybody to buy it." From the accused's point of view, several facts reasonably caused him to suspect that the transaction was not completely at arm's length: (1) the purchaser, Hill, was a family friend of the Walslebens; (2) the accused believed that the selling price was below market value; and (3) opposing counsel had prepared the transaction documents. Although the accused already had raised that issue in the dispute about whether the bankruptcy appeal was moot, he pressed it again in the adversary proceeding, because that was a forum in which the accused could conduct discovery to attempt to prove his contention that the transaction was a sham.

The substantive merits of the bankruptcy adversary proceeding are difficult to assess, and the Bar's brief on that issue does not address the merits in terms of then-existing bankruptcy law. The Bar appears to argue that the adversary proceeding was simply "too much" and that the accused was overly zealous in filing that action. The Bar, however, does not analyze the claims that the accused made in the adversary proceeding to determine whether they were legally unwarranted under DR 7-102(A)(2). The only authority that the Bar cites on that issue is *In re White*, 311 Or 573, 815 P2d 1257 (1991), for the proposition that filing duplicative actions violates DR 7-102(A)(2).

As noted above, the Bar bears the burden of showing by clear and convincing evidence that the accused violated DR 7-102(A)(2) based upon conduct that was "unwarranted" under existing law. Here, the legal context was bankruptcy law. The Bar has failed to make a sufficient argument, supported by relevant bankruptcy authorities, to support its contention under DR 7-102(A)(2) that the adversary proceeding legally was unwarranted and that no argument could be made for an extension, modification, or reversal of existing law. Instead, the tenor of the Bar's argument on review appears more appropriately addressed to a harassment claim

under DR 7-102(A)(1), a claim that it explicitly abandoned on review. That argument fails as a challenge to the legal validity of the accused's conduct under DR 7-102(A)(2) in the bankruptcy law context. We conclude that the Bar has not established that the accused violated DR 7-102(A)(2) in the adversary proceeding.

For the foregoing reasons, we conclude that the accused did not violate DR 7-102(A)(2).

## LONDON MATTER

London and her husband met during the mid-1970s and married for the first time in 1979. That marriage produced one child and ended in dissolution in 1982. Thereafter, the parties maintained an intermittent relationship, visiting each other periodically, and may have lived together between 1984 and 1986. In December 1991, the couple married again. In April 1993, however, they separated, and the husband petitioned to dissolve the marriage. London and the couple's son (then 12 years old) remained in the marital home, which the husband had owned in his own name since before the couple's first marriage.

London, who knew the accused from his prior representation of her in a bankruptcy matter, hired the accused to represent her in the dissolution proceeding. Shortly thereafter, she provided him with a written "synopsis" of the couple's relationship and an itemized settlement request. The synopsis and settlement request suggested that London expected that the entire span of the couple's relationship—not only the period of their second marriage—would factor into the outcome of the proceeding.[4] According to the accused, who had been handling divorce cases since 1976, "from the beginning [he had] viewed it as a short-term marriage" and

---

[4] The accused asserts that he did not receive the synopsis until after commencement of this disciplinary proceeding. The evidence, however, clearly and convincingly indicates that London gave that document to the accused shortly after she hired him. The Bar characterizes the synopsis as indicating that "London wanted to present the relationship as a long-term marriage." Although we agree that the document can be read in that way, we disagree with the Bar's implicit assertion that the document must be read in that way. The synopsis does not express such an intention clearly.

had informed London "that in all probability this marriage was going to be found to be a short term marriage[.]"[5]

In June 1993, as his "first order of business," the accused wrote to opposing counsel, Niedermeyer, requesting that the husband pay $200 per month in child support during the pendency of the proceedings and agree to permit London to remain in the house. The husband agreed to permit London and their son to remain in the house, but he refused to pay child support. The accused did not litigate that issue, concluding that an award of support likely would be accompanied by a requirement that London, rather than the husband, make the monthly mortgage payment.

In August 1993, the accused filed London's response to the husband's petition. Around that time, the accused also conducted informal discovery. Specifically, he orally requested from Niedermeyer information concerning the husband's debts, the husband's 1992 income tax return, his latest wage stubs, and any information related to retirement benefits. Niedermeyer gave the accused "all the information supplied to [him] by [the husband]," which apparently consisted of the husband's W-2 Form and tax return for 1992, and a pay stub from September 1993. That information did not document fully the husband's 401(k) retirement account, a profit-sharing plan, and a pension plan (collectively, "the retirement plan"). The accused did not seek further discovery; neither did he take the husband's deposition.

---

[5] Courts have applied the concept of a "short-term marriage" in the context of distributing marital assets. Broadly speaking, upon the dissolution of a short-term marriage, the "property division is a relatively simple task in the nature of a rescission." *Jenks and Jenks*, 294 Or 236, 242, 656 P2d 286 (1982). According to *Jenks*, the determination whether a marriage is "short-term" depends not upon "any specific number of months or years[,]" but, instead, upon whether "the parties' financial affairs become commingled or committed to the needs of children to the point that the parties cannot readily be restored to their premarital positions." *Id.* More recently, this court has stated that, whether one defines a short-term marriage by looking to duration or to the commingling of assets, "reliance solely on the concept of a 'short-term' marriage * * * will lead to analytical mistakes." *Massee and Massee*, 328 Or 195, 210, 970 P2d 1203 (1999) (citations omitted). Instead, the factors set out in the relevant statute, ORS 107.105(1)(f), "are the guide to the court's discretion in dividing marital property." *Id.* Our use of the term "short-term marriage" in this opinion should not be construed as an endorsement of that term.

As the case proceeded toward trial, London discussed matters with the accused "as often as was necessary," because she "wanted to make sure he had as much information as he needed, and [she] wanted to stay abreast of what was going on." She remembered at least two, and possibly three, office visits with the accused, as well as several telephone calls over the course of the representation. For his part, the accused remembered that London had "called a great deal" and recalled "many meetings with * * * London[,] who used to come, without appointment, to the office." There is no evidence in the record about the particulars of those conversations.

At some point, the accused asked London to write down for him exactly what she wanted. She listed: (1) child support; (2) to stay in the house until their son turned 18; (3) the furniture to remain in order; (4) the rights and privileges of a landlord; and (5) reliable transportation. Based in part upon that list, the accused stated that he was able "to comprehend with difficulty" that London's most important demand was that she and the couple's son be permitted to remain in the marital home until the son turned age 18. The record does not reflect at what point in the pretrial process the accused came to that conclusion. At some point, the accused also sought to establish the value of the house by driving by it and by reviewing tax assessor records for the property.

At trial call on Friday, December 10, 1993, the accused reported ready for trial, which was scheduled for the following Monday. At that time, the accused remained of the view that the marriage was a short-term one, and he even acknowledged as much to Niedermeyer that day. According to the accused, however, during trial preparation over the weekend, London "absolutely insisted that she wanted to present this relationship as a long term relationship." He also reviewed some documents that London had brought with her, some of which he believed supported the theory of a long-term marriage. Despite his continuing belief that London was on "legally shaky grounds," the accused concluded that she was entitled to make that argument.

The accused next determined that he did not have sufficient evidence, including full documentation of the retirement plan, to make the argument:

> "If in fact it was a long term relationship then I lacked the documentation to proceed and I needed more time to produce more documents. But as a short term marriage I was prepared to proceed and accomplish the primary objective of my client to remain in the residence until her son was 18 years old."

The accused used the information that he had to prepare the trial memorandum.

In that memorandum, in addition to other relief requested, the accused argued that the court should deem the parties to own the marital home as tenants in common, permit London and the couple's son to remain in the home until the son turned age 18, require the husband to make mortgage payments during that period in lieu of paying child support, and thereafter award London half the equity in the home. The memorandum is detailed factually, but contains no citation to legal authority. It appears that, in addition to relying on his recollection of what trial courts had done or said in the past in such cases, the accused consulted a continuing legal education publication to inform his understanding of the relevant legal issues.

On Monday, December 13, 1993, at the outset of trial, the accused requested a two-week continuance to present additional documentary evidence of a long-term marriage. The trial court denied that request, adding that he "virtually [would] have to treat [the marriage] as the short-term marriage it evidently is." Later, during the accused's direct examination of London, the court chided the accused for not having authority on hand to support the accused's argument for a tenancy in common. At the close of the evidence, the court also denied the accused's renewed motion for a continuance.

In its ruling on the merits, the court stated that it "must treat this case as a short term marriage" and "attempt to put the parties somewhat back in the condition that they were at the time of the marriage." As relevant here, the court awarded London possession of the marital home through

June of the following year and a judgment for $2,000 to compensate her for the increase in value of the husband's retirement plan during the marriage. The court refused to award attorney fees against the husband and later complained to the Bar about the accused's handling of the London matter.

The Bar ultimately filed a complaint alleging that, in his representation of London, the accused had acted incompetently and neglectfully in violation of DR 6-101(A) and (B). Although the Bar's pleading sets out various specifications of alleged incompetence and neglect, three main issues emerged at the trial panel hearing: (1) whether the accused had mishandled the issue of long-term versus short-term marriage; (2) whether the accused should have conducted formal discovery; and (3) whether the accused had waited too long before beginning trial preparation.

As to the first issue, the Bar's expert, Gevurtz, opined, in part, that the accused should have researched whether he could have presented the marriage as a long-term one. Gevurtz added that that area of the law "is one of the more confusing [areas]." In a later colloquy with the accused, Gevurtz asserted that "you had absolutely * * * nothing to lose by dealing with it as a long-term marriage" and that "there was really no reason right from day one" not to treat it as such. As to the second issue, Gevurtz offered his opinion that the case had called for something more persistent and formal concerning discovery and that, at a minimum, the accused should have taken the husband's deposition. Finally, as to the issue of preparation, Gevurtz was of the view that the accused had not been timely in that respect.

For his part, and in addition to other arguments and evidence, the accused relied upon the testimony of opposing counsel, Niedermeyer. Niedermeyer offered his opinion that London had been "well represented in this case." Respecting discovery, Niedermeyer testified that, "[i]n fact, I thought [the accused] was giving me a hard time because it was such a short marriage" and that the accused "was pushing pretty hard." Niedermeyer repeated several times that he always had viewed the marriage as a short-term one and stated that he "didn't think the case should have ever gone to trial."

The trial panel concluded that the accused had violated both DR 6-101(A) and (B) in his representation of London. In support of that conclusion, the trial panel found, among other things, that

"[t]he case was tried without the benefit of all available evidence regarding Mr. London's retirement plans. This evidence could have been obtained by the Accused if he had undertaken reasonable and timely discovery. The case was also tried without the Accused advancing any legal authority for the proposition the relationship between the parties was long-term."

On review in this court, the accused challenges the trial panel's determination, arguing, among other things, that he "was ready, had enough facts[,] and was prepared to argue" London's case.

DR 6-101 provides:

"(A)  A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

"(B)  A lawyer shall not neglect a legal matter entrusted to the lawyer."

This court has stated that determining whether a lawyer has provided incompetent representation in violation of DR 6-101(A) "is a fact-specific inquiry." *In re Eadie*, 333 Or 42, 60, 36 P3d 468 (2001). So too, we conclude, is the determination whether a lawyer has neglected a legal matter. We also emphasize that the standard for assessing competence and diligence is an objective one; the lawyer's mental state is irrelevant. *Compare* DR 7-101(A)(3) (lawyer shall not "intentionally * * * [p]rejudice or damage the lawyer's client * * *"); *In re Collier*, 295 Or 320, 328, 667 P2d 481 (1983) (" 'Intentionally' is a material and key element of DR 7-101(A)(3)."). Instead, the court will consider whether a lawyer who has violated DR 6-101 acted intentionally, knowingly, or negligently only as one of the factors in determining the appropriate sanction. As a final general observation that applies to both subsections of DR 6-101, we note that the *outcome* of a matter in which a lawyer has acted incompetently or neglectfully is not a pertinent consideration. *In re Gastineau*, 317 Or

545, 555, 857 P2d 136 (1993) ("If a lawyer does a poor job, but the client fortuitously or through the efforts of others obtains a good result, that does not excuse the lawyer from providing competent representation or justify neglecting the case.").

Moving to the subsections of DR 6-101, and beginning with competence under subsection (A), this court has stated that the best measure for determining lawyer competency is "the standard stated in DR 6-101(A) itself." *Id.* at 554. That standard requires a lawyer to employ the "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." DR 6-101(A). We pause to note, however, that incompetence and negligence are not synonymous terms. A lawyer—otherwise knowledgeable, skillful, thorough, and prepared—might commit a misstep for which he or she might have to respond in damages. That lawyer, although negligent, has not violated DR 6-101(A). Conversely, but less likely, a lawyer might act without the legal knowledge, skill, thoroughness, or preparation necessary for the representation, but commit no misstep that gives rise to an actionable negligence claim. That lawyer would have acted incompetently, but not negligently. Consequently, and as the factors set out in DR 6-101(A) themselves suggest, this court's inquiry in competence cases generally has focused upon the reasonableness of the accused lawyer's conduct in the broader context of the representation, rather than in respect of specific aspects of the representation. *See, e.g.,* *Gastineau,* 317 Or at 553-54 (incompetence often found when "there is a lack of basic knowledge or preparation[,]" but not when lawyer "showed experience and professional ability" or Bar failed to prove that position was taken " 'in pretense or bad faith, or in culpable ignorance' "). That, however, will not always be the case; the analysis remains a fact-specific one.

We proceed to consider neglect, or lack of diligence, under DR 6-101(B). One commentator has described lack of diligence as "a special and wide-spread variety of incompetence," consisting of "incompetently failing to act when advancing or protecting a client's interests calls for action," and as ranging from "virtual abandonment of the client to procrastination." Charles Wolfram, *Modern Legal Ethics* 191 (1986).[6] As with competence, neglect is not interchangeable

---

[6] The Bar may elect to allege in a particular instance that the same conduct constitutes both neglect and incompetence. Because neglect is a subset of

with negligence: "A lawyer's neglect of a client's business does not necessarily give rise to actionable negligence." *In re Chambers*, 292 Or 670, 674 n 3, 642 P2d 286 (1982). At the same time, however, this court recently has stated that, "[t]o prove a violation of DR 6-101(B), the Bar must show a course of *negligent* conduct." *Eadie*, 333 Or at 64 (internal quotation marks omitted; emphasis added); *see also Collier*, 295 Or at 328-29 (noting that court in prior cases had contrasted course of conduct with "isolated" acts of "ordinary negligence"). We adhere to the principal construct set out in *Eadie*: Neglect in the context of DR 6-101(B) is the failure to act or the failure to act diligently. It requires this court to view a lawyer's conduct along a temporal continuum, rather than as discrete, isolated events. To avoid confusion, however, we restate the Bar's burden under DR 6-101(B) as requiring clear and convincing evidence of a course of *neglectful* conduct.

■    With those principles in mind, we proceed to determine whether the Bar has proved that the accused acted neglectfully or incompetently in representing London. At the outset, our review of the record leaves the clear impression that, at least until the weekend before trial, the accused both viewed and prepared to try London's dissolution case as involving only a short-term marriage. The accused's belief that the marriage was short term appears to have affected many of the actions that he took, and did not take, in the representation. Accordingly, we begin with an assessment of the accused's determination that the London matter involved a short-term marriage.

The record demonstrates that the accused settled upon his theory that the marriage was a short-term one quickly, almost matter-of-factly, and without the benefit of substantial legal research. Moreover, the fact that the accused somewhat altered his theory of the case shortly before trial arguably suggests that his earlier preparation was inadequate. Nevertheless, as set out below, when we view those factors against the record as a whole, we are unable to conclude that the Bar has proved that the manner in

---

incompetence, and also because, in such a case, a determination that the accused lawyer violated both DR 6-101(A) and (B) would not affect the sanction analysis, this court in such cases normally will not address the competency issue. *See, e.g., In re Kimmell*, 332 Or 480, 31 P3d 414 (2001) (applying principle in analogous context).

which the accused adopted his initial theory of the case was neglectful or incompetent.

As a preliminary matter, we reject the Bar's argument that the accused in essence ignored his client's wishes. As noted, we have discounted the significance of the synopsis that London provided to the accused, upon which the Bar's argument primarily relies, and there is no other evidence in the record that clearly indicates that London directed the accused to present the case in one way or another.

As to the adequacy of the factual and legal bases upon which the accused formed his theory of the case, we note that the accused was familiar with London from the prior representation, that he maintained something approaching regular contact with her, and that the record does not disclose the specifics of those communications. Moreover, by the time of the representation, the accused had acquired substantial experience with divorce cases. Finally, in shaping his understanding of the case, the accused relied to some extent on prior discussions of the law in that area by trial courts.

We also deem as having some relevance to our inquiry the fact that both the trial court and opposing counsel espoused the same view of the case as the accused's initial view. And, significantly, the Bar's expert did not go so far as to state a legal opinion that, considering the nature of the couple's relationship, London's second marriage properly should have been viewed as a long-term one. Instead, he emphasized only that the accused had nothing to lose by arguing for a longer duration relationship. Finally, the Bar has not cited any domestic relations case law or other authority that would tend to demonstrate that the accused should have viewed the case as presenting a long-term marriage.

Considering all the foregoing factors together, as well as the record as a whole, the Bar has demonstrated that the accused should have rested his initial theory of the case on a stronger foundation. The Bar, however, has failed to prove that it is highly probable that the accused's legal conclusions or the manner in which he came to them were so unreasonable as to support a determination of either incompetence or neglect. Accordingly, we proceed to consider

whether the accused adequately handled the dissolution of a short-term marriage. Because we conclude that the Bar's arguments that the accused was neglectful under DR 6-101(B) do not require an extended discussion, we begin with that rule.

■    In the course of his approximately six-month representation of London, the accused (1) informally attempted to obtain interim relief for her; (2) filed a response in her behalf; (3) conducted limited informal discovery; (4) met or spoke with her on a number of occasions; (5) prepared a factually detailed trial memorandum; and (6) tried the case. For its part, the Bar points to actions that the accused did not undertake and takes issue with the manner in which the accused carried out some of the tasks that he did undertake. Those arguments are tenable. On balance, however, when those shortcomings are viewed along the continuum of the representation, we disagree with the Bar that this record demonstrates neglect of a legal matter. The accused did not miss deadlines, and the case did not languish. In short, there was no course of neglectful conduct. The accused did not neglect a legal matter in violation of DR 6-101(B).

■    Determining whether the accused acted incompetently under DR 6-101(A) in this matter presents a closer question. The focal points of the Bar's case are the level of discovery respecting the husband's retirement plan and the point at which the accused began his trial preparation. Respecting discovery, we question the overall significance in London's case of information about her husband's retirement plan. The focus here was to restore the parties to their premarital positions. Moreover, we do not accept the Bar's argument that minimum standards of professional competence required the accused to depose the husband either as a general matter or specifically as to the retirement plan. Considering together the lack of complexity of the case, the state of this record, and the burden of proof, the Bar has not proved by clear and convincing evidence that the accused's limited discovery efforts in London's behalf constituted an unreasonable level of thoroughness or preparation.

■    As a final matter, we consider the timing of the accused's trial preparation. By all accounts, the accused did

not begin trial preparation until the weekend before the Monday setting and only after having reported ready at trial call on Friday morning. That timing suggests a lack of reasonable preparedness. *See, e.g., Chambers*, 292 Or at 678 (record left "distinct impression that [the accused lawyer] prepared and tried the criminal case 'by the seat of his pants'"). Moreover, the work that remained to be completed that weekend was not limited to memorializing legal arguments and preparing exhibits for trial. The accused still needed to review, as an initial matter, some of London's documents. That fact, and the fact that the accused ultimately offered no legal citation in support of his position, suggests in this context a lack of reasonable thoroughness. *See, e.g., Eadie*, 333 Or at 61 (accused lawyer who, among other things, failed to order copy of client's deposition transcript for use at trial violated DR 6-101(A)).

We must assess those concerns, however, in the context of the legal and factual circumstances of the case that the accused litigated. Concerning the factual circumstances of London's case, the couple was of modest means, there was comparatively little property to distribute, and the issues of contention were few. Moreover, the accused's grasp of the pertinent facts at trial, notwithstanding that he began preparing late, supports his assertion that he ultimately "had enough facts" to argue London's case.

Concerning the legal circumstances of the case, and as we noted earlier, the distribution of property in a short-term marriage dissolution usually "is a relatively simple task in the nature of a recission." 335 Or at 315 n 5 (*citing Jenks*, 294 Or at 242). Once the question whether the accused should have viewed the marriage as a long-term one is removed from the equation, we cannot describe the case as legally complicated. In the context of that simple case, we conclude that the accused both had and conveyed a sufficient understanding of the pertinent legal issues to avoid violating DR 6-101(A).

Finally, we note that, although for purposes of this opinion we have grouped the Bar's arguments on review into specific categories, we have considered each of the arguments that the Bar advanced in support of its position. Having done

so, and applying the standard that DR 6-101(A) sets out in the broader context of the accused's representation of London as a whole, the record does not demonstrate that it is highly probable that the accused acted incompetently in violation of DR 6-101(A).

In conclusion, the Bar has not proved by clear and convincing evidence that the accused violated DR 7-102(A)(1) or (2) in the Korgan matter, or DR 6-101(A) or (B) in the London matter.

Complaint dismissed.