**IN THE MATTER OF THE SUSPENSION OF B. PATRICIA WELCOME, ESQUIRE AS A MEMBER OF THE VIRGIN ISLANDS BAR**

S. Ct. Civil No. 2013-0075

Supreme Court of the Virgin Islands

December 5, 2013

240

241

242

Gᴇʀᴛʀᴜᴅᴇ LᴇCᴏɪɴᴛᴇ, Esǫ., St. Croix, USVI, *Attorney for B. Patricia Welcome, Esq.*

SIMONE R.D. FRANCIS, ESQ., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., St. Thomas, USVI, *Attorney for V.I. Bar Ass'n Ethics & Grievance Committee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(December 5, 2013)

PER CURIAM. This matter comes before the Court pursuant to an appeal filed by B. Patricia Welcome, Esq., from an adverse disposition of the Ethics and Grievance Committee of the Virgin Islands Bar Association ("EGC"). Also before the Court is a request by the EGC to approve its recommended sanction of a six month suspension and payment of $60,000 in restitution or, if this Court does not approve the restitution award, disbarment. Because we agree with Welcome that the underlying conduct does not warrant any sanction, we sustain her appeal, deny the EGC's request for disciplinary action, and direct the EGC to dismiss the underlying grievance.

## I. BACKGROUND

Joseph Wiegand and David Nelson jointly purchased a property in St. Croix in 1990, which they occupied as tenants by the entirety. Although Wiegand left St. Croix in 1997, Nelson continued to occupy the property. In early 2002, Wiegand executed two documents, both dated March 19, 2002, that gave Nelson a power of attorney so that he could sell the property. In one document, signed only by Wiegand and Nelson, Wiegand provided Nelson with a power of attorney conditioned on payment of $15,000 on or before sale of the property, with Nelson agreeing to pay all liens; another document, signed by Wiegand and Nelson in the presence of two witnesses and a notary, granted Nelson power of attorney over all matters pertaining to Wiegand's estate, finances, and investments, with no mention of any payments.

In early 2003, one of Wiegand's friends informed him that Nelson had found a buyer for the property and intended to sell it without giving advance notice to Wiegand. Rather than attempt to speak with Nelson, Wiegand contacted a loan officer at Scotia Bank — which had a mortgage on the property — who informed him that the house was likely selling,

and recommended that he obtain legal representation. Wiegand spoke with Welcome on the telephone on April 10, 2003. It is undisputed that during their discussion, Wiegand explained the situation to Welcome, who orally agreed that she would represent him at the closing for the sale of the property. Wiegand, however, contends that Welcome stated that she would revoke the power of attorney, whereas Welcome maintains that she instructed Wiegand to revoke it himself.

The next day, Welcome mailed a letter to the realtor, which stated that Wiegand had revoked Nelson's power of attorney and requested that she be contacted with respect to all matters related to the property's sale. On May 6, 2003, Welcome mailed a retainer agreement to Wiegand, along with a power of attorney form that, once executed, would give Welcome a power of attorney to sell the property. In this mailing, Welcome also enclosed the Offer to Purchase that Nelson had signed and provided to the realtor. The May 6, 2003 letter also identified all of the liens on the property. Wiegand mailed the executed documents to Welcome on May 13, 2003; Welcome, however, maintained that she did not receive them until June 9, 2003.

On June 9, 2003, Welcome faxed the documents to the realtor and to Nelson's counsel. However, unbeknownst to Wiegand or Welcome, Nelson had used Wiegand's earlier grant of a power of attorney to execute a deed of gift on April 24, 2003, in which he transferred Wiegand's interest in the property to himself. Nelson recorded that deed of gift on May 20, 2003, and ultimately sold the property on May 24, 2003, with the sale recorded on May 30, 2003. After paying all encumbrances, Nelson received a net $99,230.42 from the sale, but did not provide Wiegand with any portion of the proceeds.

Shortly afterwards, Wiegand repeatedly called Welcome. Again, Wiegand and Welcome dispute the contents of those calls; while Wiegand maintains that he never spoke with Welcome personally, Welcome contends that she advised him of the status of the transaction, and that any attempt at a recovery in light of what had transpired in late April and May 2003 would require litigation which was outside the scope of the retainer agreement. Welcome also maintains that Wiegand used many of these telephone calls to pester her or to complain about Nelson's betrayal, and therefore eventually stopped accepting his calls.

Wiegand filed a grievance against Welcome with the EGC on August 1, 2003; however, for inexplicable reasons, the matter simply remained

dormant for several years. Ultimately, Welcome submitted an answer on June 29, 2009. On December 17, 2009, the panel issued a Notice of Hearing, stating that probable cause existed to establish that Welcome violated Model Rules of Professional Conduct 1.1 and 1.4, and scheduled a hearing for February 6, 2010. After considering both testimony and documentary evidence introduced at the February 6, 2010 hearing, the panel issued its decision on August 8, 2012, which found that Welcome violated Model Rules 1.1 and 1.4 and, as a sanction, recommended a six month suspension from the practice of law and payment of $60,000 in restitution and $1,572.75 in costs. However, in the alternative, the panel recommended disbarment. One member of the panel, however, dissented solely as to the restitution amount, finding restitution inappropriate in light of the fact that Welcome had never collected any fee from Wiegand or stolen any of his funds. Welcome moved for an extension of time to file a motion for reconsideration of the panel decision, which the panel chair granted; however, in a May 29, 2013 Order, the panel denied Welcome's motion for reconsideration. Welcome filed her notice of appeal with this Court on September 12, 2013.

## II. JURISDICTION AND LEGAL STANDARD

"This Court, as the highest court of the Virgin Islands, possesses both the statutory and inherent authority to regulate the practice of law in the Virgin Islands." *In re Gonzalez*, 59 V.I. 862, 864 (V.I. 2013) (citing 4 V.I.C. § 32(e)). This authority encompasses the power to discipline attorneys for ethical misconduct. *In re Suspension of Adams*, 58 V.I. 356, 361 (V.I. 2013). The EGC, an arm of this Court, assists in this function by "perform[ing] quasi-judicial functions" that "are subject to clearly defined rules and procedures adopted and approved by this Court." *In re Rogers*, 57 V.I. 553, 561 (V.I. 2012). When reviewing a decision rendered by the EGC,

> we exercise independent judgment with respect to both findings of fact and conclusions of law on all issues, including the sanction recommended by the Bar. Under our independent review, we carefully consider the adjudicatory panel's analysis, but must separately determine, like the adjudicatory panel, whether there is clear and convincing evidence that the respondent violated the Model Rules of Professional Conduct. Our review in this respect is virtually de novo, except we do

not hear and consider anew live testimony. If we find that the respondent has violated the rules, we must also decide whether to adopt the panel's recommended discipline or whether some other type of discipline is warranted.

*V.I. Bar v. Brusch*, 49 V.I. 409, 411-12 (V.I. 2008) (footnotes and citations omitted).

## III. DISCUSSION

As noted above, the EGC only charged Welcome with violating Rules 1.1 and 1.4 of the Model Rules of Professional Conduct, and ultimately concluded that she violated both of these ethical rules. We address each conclusion in turn.

### A. Model Rule 1.1

■ Model Rule 1.1 mandates that "[a] lawyer shall provide competent representation to a client," with "[c]ompetent representation requir[ing] the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." In its decision, the panel explained its reasoning as follows:

> [Welcome] accepted the responsibility to represent [Wiegand] and to provide competent representation in an effort to protect [Wiegand]'s title and interest in the Property and to protect [Wiegand]'s share of the sale proceeds. She knew of the upcoming real estate closing, knew that the adverse party was attempting to use a previously-executed Power of Attorney to exclude [Wiegand], and she knew that her client was entitled to approximately $60,000.00 of the closing proceeds.
>
> [Welcome] was provided with a Power of Attorney from [Wiegand]. Nonetheless, [Welcome] wrote a single letter to the realtor and then did nothing else to protect her client's interest. She was not thorough as she did virtually no work on the matter. She was not prepared, and in fact took no steps to prepare the case. She did not exercise skill or knowledge, as she did less than the bare minimum and ultimately allowed the closing to take place without her client. Her representation was wholly incompetent within the meaning of Rule 1.1, and [Welcome] therefore violated Rule 1.1 of the Model Rules of Professional Conduct.

(Dec. 3.)

■■ The panel's decision is not supported by clear and convincing evidence, which we reiterate "requires evidence sufficient to 'enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue.' " *In re Campbell*, 59 V.I. 701, 716 (V.I. 2013) (quoting *In re Adoption of J.J.*, 515 A.2d 883, 886 (Pa. 1986)). "A lawyer's negligence in handling a matter does not necessarily constitute a violation of [Rule] 1.1." *In re Alexander*, 232 Ariz. 1, 300 P.3d 536, 543 (2013). Importantly, "[t]he focus is not on whether a lawyer may have neglected a particular task, but rather whether his or her representation in the 'broader context of the representation' reflects the knowledge, skill, thoroughness, and preparation that the rule requires." *In re Obert*, 352 Ore. 231, 282 P.3d 825, 837-38 (2012) (quoting *In re Magar*, 335 Ore. 306, 66 P.3d 1014, 1022 (2003)). Moreover, "[i]t cannot be an ethical violation to fail to take action that would have been futile." *Attorney Grievance Comm'n of Maryland v. Rand*, 429 Md. 674, 57 A.3d 976, 991 (2012).

■ In this case, the uncontradicted evidence in the record establishes that neither Wiegand nor Welcome knew the date of the real estate closing. Nor is there any evidence that — at the time the attorney-client relationship commenced — Welcome knew that Nelson intended to exclude Wiegand, given that the sole basis for this belief was the apparently unsubstantiated speculation of Wiegand's friend. Significantly, one of the documents purporting to be a power of attorney between Wiegand and Nelson explicitly states that Nelson would pay all liens on the property and would pay Wiegand $15,000 no later than the date of the sale of the property, and neither power of attorney required Nelson to notify Wiegand of a potential buyer or to approve the ultimate purchase agreement. And contrary to the panel's findings, Welcome did far more than write a single letter to the realtor — the May 6, 2003 letter, which set forth all of the liens on the property, reflects that Welcome had also done a title search. And since the April 24, 2003 deed of gift had not been recorded until May 20, 2003, the failure of the May 6, 2003 letter to reference that deed cannot be evidence of incompetence, given that it would not have appeared as part of Welcome's title search.

■■ Likewise, the fact that Welcome did not attend the closing, despite being retained to do so, does not, without more, rise to the level of a Model Rule 1.1 violation. *See, e.g., In re Mulhall*, 159 Ariz. 528,

768 P.2d 1173, 1176 (1989) (holding that negligently allowing a statute of limitations to run does not constitute an ethical violation). But as noted above, Wiegand did not tell Welcome when the closing was scheduled to occur — likely because he himself did not know the date — and the very next day after being retained, Welcome contacted the realtor to inform him that she had been retained as Wiegand's counsel and that she should receive notice of all events relating to the sale of the property. The fact that the realtor failed to honor that request cannot establish a Model Rule 1.1 violation. More importantly, once Nelson used his power of attorney to execute the April 24, 2003 deed of gift, Welcome's attendance at the May 24, 2003 closing — even if she had been aware of it — would have been meaningless, since Wiegand no longer had an interest in the property.[1] While Wiegand possessed other options to obtain redress against Nelson, such as suing him, Welcome was under absolutely no obligation to pursue those options, given that the record reflects that she and Wiegand had contractually agreed to limit her representation to a single transaction — the sale of the property. *See* MODEL R. OF PROF'L CONDUCT 1.2(c) ("A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."). Consequently, we reject the EGC's conclusion that Welcome violated Model Rule 1.1.[2]

## B. Model Rule 1.4

■ The panel also found that Welcome violated Model Rules 1.4(a)(2), (3), and (4), which require a lawyer to reasonably consult with the client, keep the client reasonably informed about the status of the matter, and

---

[1] At the February 6, 2010 hearing, the case investigator emphasized that the deed of gift, while executed on April 24, 2003, had not been recorded until May 20, 2003. However, as this Court has previously held, it is the date of execution, and not the date of recording, that is the significant date, since an unrecorded conveyance is only ineffective as to an innocent purchaser for value, but remains valid as to the parties to it. *Harvey v. Christopher*, 55 V.I. 565, 574-75 (V.I. 2011).

[2] We recognize that Wiegand testified at the February 6, 2010 hearing that Welcome had agreed to revoke the power of attorney for him, whereas Welcome contended that she advised Wiegand to draft and mail the revocation himself. Although the panel found that Welcome should have revoked the power of attorney after receiving Wiegand's response to her May 6, 2003 correspondence, we note that Welcome received those documents after Nelson already executed and recorded the April 24, 2003 deed of gift. And in any event, we again emphasize that the EGC never charged Welcome with violating Model Rule 1.2 in this matter.

249

promptly comply with reasonable requests for information. In its decision, the panel explained its determination as follows:

> In this case, [Welcome] spoke to [Wiegand] only enough to learn of the upcoming real estate sale and to come to understand that his interests were threatened by [Nelson]. [Welcome] then simply stopped taking [Wiegand's] phone calls. Numerous calls were made to [Welcome]'s office without response. [Welcome] failed to consult with her client, did not keep him informed at all, and did not respond to his inquiries and requests for information. Therefore, [Welcome] violated Rules 1.4(a)(2), (3) and (4) of the Model Rules of Professional Conduct.

(Dec. 3-4.)

■ We disagree with the panel's finding that Welcome's April 10, 2003 conversation with Wiegand was deficient to such an extent as to constitute a violation of Model Rule 1.4. Based on the testimony at the February 6, 2010 hearing, it is clear that during this conversation Welcome obtained all of the factual background from Wiegand necessary to understand the nature of the agreed-upon representation. Moreover, the record reflects that the panel is incorrect in finding that Welcome simply stopped speaking to Wiegand after that conversation, since she sent him correspondence on May 6, 2003, and Wiegand's own phone log reveals that they spoke for at least eleven minutes on May 13, 2003.

We also highly question the panel's decision to apparently credit Wiegand's testimony over Welcome's version of events. As a threshold matter, we note that one of the most significant claims in Wiegand's August 1, 2003 grievance — that he had not spoken with Welcome since May 1, 2003 — is easily defeated by his own phone logs. Moreover, while the phone logs Wiegand provided do show five calls of approximately two minutes duration in June 2003 from his phone to Welcome's office, which would be consistent with Wiegand's testimony to have left messages with Welcome's secretary, we note that these phone logs only show outgoing calls, and do not reflect any incoming calls. In other words, the phone logs do not rebut Welcome's testimony that she did return Wiegand's phone calls, but at varying times received either no answer or a message indicating that the line was disconnected.

■ The panel is correct, however, that Welcome failed to properly explain to Wiegand what precisely transpired and that their attorney-client

250

relationship had come to an end. By her own admission, Welcome ceased accepting Wiegand's phone calls at a certain point. Moreover, during her testimony, Welcome stated that she discovered a draft of a July 13, 2003 letter to Wiegand that would have responded to his inquiries, but that apparently had never been sent. Consequently, based on her own admissions, we agree with the panel that Welcome failed to "keep the client reasonably informed about the status of the matter." MODEL R. PROF'L CONDUCT 1.4(a)(3).

## C. Sanctions

■ Having concluded that Welcome violated Model Rule 1.4(a)(3), we must determine the appropriate sanction, if any. As we have previously explained,

> When conducting this inquiry, this Court "consider[s] the following four factors: '[1] the duty violated; [2] the lawyer's mental state; [3] the potential or actual injury caused by the lawyer's misconduct; and [4] the existence of aggravating or mitigating factors.' " *Brusch*, 49 V.I. at 420 (quoting STD'S FOR IMPOSING LAWYER SANCTIONS § III.B., Std. 3.0 (1986 as amended 1992)). "The Court considers the first three factors to initially determine the appropriate sanction," and only "consider[s] the presence of any relevant aggravating or mitigating factors to determine whether to depart from that initial determination." *Id.* Furthermore, in crafting the appropriate sanction, this Court is "mindful that the purpose of disciplinary sanctions . . . 'is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession.' " *Id.* at 419 (quoting STD'S FOR IMPOSING LAWYER SANCTIONS § III.A., Std. 1.1).

*Adams*, 58 V.I. at 363-64. In its decision, the panel identified disbarment as the baseline sanction and outlined numerous aggravating factors, but ultimately recommended a six month suspension contingent on payment of $60,000 of restitution or, in the alternative, disbarment.

At the outset, we note that the EGC's recommended sanction — which would impose a six month suspension in lieu of disbarment contingent solely on payment of restitution — is wholly inconsistent with the

251

purpose of the attorney discipline system, for the risk Welcome poses to the public, the legal system, and the legal profession remains the same regardless of whether she pays restitution. "Rather, the proposed sanction would either act as an impermissible punishment" in the event she lacks the means to pay the restitution award, "or would use the attorney discipline system to further [Wiegand]'s private interests by granting him a *de facto* lien on [Welcome]'s law license." *Id.* at 364.

■ ■ We also agree with the dissenting panel member that no restitution is warranted in this case. As noted above, the purpose of the attorney discipline system is not to vindicate private interests of grievants. For this reason, courts have repeatedly held that an attorney discipline proceeding is not a substitute for a legal malpractice action. *See, e.g., In re Myers,* 164 Ariz. 558, 795 P.2d 201, 204 n.3 (1990); *Florida Bar v. Neale,* 384 So. 2d 1264, 1265 (Fla. 1980). While this Court has permitted restitution orders in attorney discipline cases, it has explicitly adopted the disgorgement theory of restitution, which limits restitution solely to monies that the attorney has actually taken from the client, such as the attorney's compensation for the matter in which the ethical breach occurred. *See In re Suspension of Welcome,* 58 V.I. 604, 619 n.8 (V.I. 2013) (citing RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37 (2000)). Since Welcome collected no fee from Wiegand in this matter, we agree with the dissenting panel member that Wiegand is not entitled to any restitution, and that his remedy against Welcome — if any — would have been a civil suit for legal malpractice.

■ Turning to the panel's analysis of the *Brusch* factors, we find absolutely no basis for its identification of disbarment as the baseline sanction. Although the panel invoked ABA Standard 4.41[3] — which calls for disbarment if "a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client" — as support for its decision, we first note that this standard relates to violations involving a lack of diligence, and again emphasize that the EGC never charged Welcome with violating Model Rule 1.2. Therefore, ABA Standard 4.41 is wholly inapplicable to this case.

■ We conclude that ABA Standard 4.64,[4] which provides that an "[a]dmonition is generally appropriate when a lawyer engages in an

---

[3] STD'S FOR IMPOSING LAWYER SANCTIONS § III.C., Std. 4.41(b).
[4] STD'S FOR IMPOSING LAWYER SANCTIONS § III.C., Std. 4.64.

isolated instance of negligence in failing to provide a client with accurate or complete information, and causes little or no actual or potential injury to the client," is the more applicable standard for this case. We find no basis in the record for the panel's implicit finding that Welcome committed a knowing violation, given our holding that Welcome never violated Model Rule 1.1 and the fact that Welcome introduced evidence that she had prepared a letter which she intended to mail to Wiegand on July 2003 but for whatever reason was never actually sent, which establishes that Welcome had intended to apprise Wiegand of what transpired and formally terminate the attorney-client relationship. Likewise, on this record, we find no basis to hold that Wiegand suffered any actual or potential injury — let alone a serious injury — as a result of Welcome's conduct. Rather, the record demonstrates that all of the harm Wiegand may have suffered can be attributed to Nelson's actions, rather than any act or omission on Welcome's part. Moreover, Wiegand found out about the property sale and other material events well within the applicable statute of limitations, and even testified to having consulted with lawyers about the feasibility of bringing a civil action. Thus, Welcome's failure to communicate did not deprive Wiegand of the opportunity to sue Nelson, Welcome, the realtor, or any other party he may have deemed responsible for what transpired.

■ We also disagree with the panel's identification, and weighing, of aggravating and mitigating factors. In mitigation, the panel noted that Welcome lacked a prior disciplinary history. While this was true at the time the panel adjudicated Wiegand's grievance, this Court has since disciplined Welcome for unrelated misconduct stemming from a grievance filed after the instant matter commenced. *See Welcome*, 58 V.I. at 619. Therefore, consistent with our prior practice, we shall treat Welcome's disciplinary history as a neutral factor, declining to treat her subsequent disciplinary history as an aggravating factor, but also not providing her with the ability to claim an absence of prior discipline as a mitigating factor. *See In re Suspension of Joseph*, 56 V.I. 490, 506 n.8 (V.I. 2012).

In aggravation, the panel found "a refusal to acknowledge the wrongful nature of the conduct, substantial experience in the practice of law, vulnerability of the victim, violations of multiple rules of conduct, and indifference to making restitution." (Dec. 4.) We agree that Welcome, through her testimony, established that she possessed substantial

experience in the practice of law, particularly in the field of real estate. However, the record does not support any of the panel's remaining findings. Given our holdings that she only violated Model Rule 1.4(a)(3) and did not owe any restitution to Wiegand, violations of multiple ethical rules and indifference to making restitution cannot serve as aggravating factors. Additionally, the record contains absolutely no evidence to support the panel's finding that Wiegand — a businessman who clearly devoted substantial time in obtaining redress in this matter — was a particularly vulnerable victim for purposes of the ABA Standards. *See Welcome*, 58 V.I. at 617-18 (collecting cases). Similarly, we can find nothing in the record to support the panel's finding that Welcome refused to acknowledge the wrongful nature of her conduct. To the extent the finding was based on the fact that Welcome contested the charges against her, holding the panel to its standard of proof, without more, is not sufficient to sustain a finding of aggravation under ABA Standard 9.22(g).[5] *Id.* at 618. In fact, we note that it was Welcome who brought the unsent July 2003 letter to the panel's attention, and that she expressly stated at the hearing that she could have done things better with respect to communicating with Wiegand, such as ensuring that a letter had actually been sent to him. (App. 138.)

We also find that the panel ignored an obvious mitigating factor: the absence of a dishonest or selfish motive. STD's FOR IMPOSING LAWYER SANCTIONS § III.C., Std. 9.32(b). At the February 5, 2010 hearing, the uncontradicted evidence established that Welcome received no compensation from Wiegand, and that she did not even attempt to collect her fee from him, even though he had agreed to pay her $200.00 an hour and she clearly spent some time investigating the matter, including conducting a title search. Upon our review of the record, we simply cannot see how Welcome's failure to communicate with Wiegand benefited her, financially or otherwise.

 Upon weighing the one aggravating and one mitigating factor, we see no reason to depart from the baseline sanction of a private reprimand. However, our analysis is complicated by the fact that we are precluded from imposing a private reprimand as a sanction after an appeal or petition for disciplinary action has been filed with us, *see* V.I.S. CT. R.

---

[5] STD's FOR IMPOSING LAWYER SANCTIONS § III.C., Std. 9.22(g).

207.4.3(c) ("The court may impose any sanction .. . . with the exception of a private reprimand."), for the practical reason that such a reprimand cannot be private by virtue of the fact that an attorney discipline matter filed with this Court is a public proceeding. In such an unusual situation, where our consideration of the ABA Standards compels a private reprimand — a sanction which we cannot impose as a practical matter — our only options are to impose a public reprimand, or to not order any formal discipline at all and simply dismiss the grievance. *See, e.g., In re Discipline of Tornow*, 2013 SD 61, 835 N.W.2d 912, 922-23, 926-28 (2013); *State ex rel. Counsel for Discipline v. Murphy*, 283 Neb. 982, 814 N.W.2d 107, 109 (2012) (ordering public reprimand when private reprimand not possible due to disciplinary proceedings already being public); *In re Dunn*, 713 So. 2d 461, 463 (La. 1998) (hearing committee concluded that an admonition was the appropriate sanction, but since that remedy could not be imposed once proceedings became public upon filing of formal charges it declined to impose any sanction); *In re Hoffman*, 2005 ND 153, 703 N.W.2d 345, 352 (2005) (declining to impose discipline, despite Model Rule 1.1 violation stemming from failure to timely file petition for post-conviction relief, when misconduct constituted ordinary negligence stemming from failure to locate controlling precedent on timeliness issue).

██ Here, we conclude that the interests of justice warrant imposing no formal sanction. We share the concerns expressed by other courts about the use of attorney disciplinary proceedings as a mechanism to punish an attorney for isolated acts of ordinary negligence. *See, e.g., Lewis v. State Bar of Cal.*, 28 Cal. 3d 683, 170 Cal. Rptr. 634, 621 P.2d 258, 261 (1981) (noting "the problems inherent in using disciplinary proceedings to punish attorneys for negligence, mistakes in judgment, or lack of experience or legal knowledge"); *Hoffman*, 703 N.W.2d at 348 ("Most decisions and official ABA policy insist that a single instance of 'ordinary negligence' is usually not a disciplinary violation . . . .") (quoting Charles W. Wolfram, *Modern Legal Ethics* § 5.1 at 190 (1986)); *In re Gygi*, 273 Ore. 443, 541 P.2d 1392, 1396 (1975) ("we are not prepared to hold that isolated instances of ordinary negligence are alone sufficient to warrant disciplinary action"). While Welcome eventually stopped taking Wiegand's phone calls, the record reflects that she did not intend to simply abandon him, but instead wrote him a letter outlining what had transpired that, apparently due to ordinary negligence, was never actually

255

sent. Although these circumstances may have warranted a private reprimand had the EGC exercised its discretion to impose such a sanction, with our choice limited to either a public reprimand or no sanction at all, we find the rules violation sufficiently *de minimis* and decline to impose discipline.[6] *Hoffman*, 703 N.W.2d at 352.

## IV. CONCLUSION

For the foregoing reasons, we sustain Welcome's appeal, deny the EGC's request to accept its recommended sanction, and remand this matter to the EGC so that it may dismiss Wiegand's grievance.

---

[6] Given our decision to not impose any sanction for Welcome's *de minimis* Model Rule 1.4 violation, we also decline to assess the costs of the EGC proceeding against her.