SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| In the Matter of a Member of the State Bar of Arizona | ) Arizona Supreme Court ) No. SB-12-0039-AP ) |
| RACHEL R. ALEXANDER, Attorney No. 20092 | ) Office of the Presiding ) Disciplinary Judge ) No. PDJ20119002 |
| Respondent. | ) ) |
| | ) **O P I N I O N** ) ) |
| _____ | ) |

Appeal of Hearing Panel Opinion and Disciplinary Order from the
Office of the Presiding Disciplinary Judge

**SUSPENSION ORDERED**

_____

Rachel Alexander                                                    Phoenix
In Propria Persona


John S. Gleason                                                    Denver, CO
Alan C. Obye
James S. Sudler
Independent Bar Counsel
Attorney for State Bar of Arizona

_____


**T I M M E R**, Justice

**¶1**      This case presents our first opportunity to issue an

opinion on the propriety of findings made and discipline imposed

by a hearing panel under our new attorney-discipline procedures. We accept the panel's determination that Rachel R. Alexander violated Arizona Rules of Professional Conduct ("ERs") 1.1, 1.7(a)(1), 3.1, and 8.4(d) and former Arizona Supreme Court Rule 53(d) and (f).[1]  We disagree she violated ERs 1.7(a)(2), 3.4(c), and 4.4(a).  We reduce her suspension to six months and, as a condition for reinstatement, require her to take ten hours of classes focusing on the ethical responsibilities of Arizona lawyers.

**BACKGROUND**

**¶2**      Alexander was admitted to the State Bar of Arizona in 2000.  She met Andrew Thomas in 2004 while he was campaigning for the office of Maricopa County Attorney.  After Thomas was elected, Alexander became a deputy county attorney and his special assistant.  Alexander did not directly handle cases but assisted trial lawyers with "behind-the-scenes work" and performed non-legal tasks like disseminating information to the public through websites, social media, and speeches.

**¶3**      Starting in 2006, the Maricopa County Attorney's Office ("MCAO") became embroiled in well-publicized disputes, lawsuits, investigations, and criminal prosecutions variously

---

[1]      Effective January 1, 2011, Rule 53 was renumbered and amended as Rule 54.  Throughout this opinion, we refer to the former version of the rules as "former Rule ____" and the current version as "Rule ____."  Unless otherwise indicated, we cite to the current version of the Rules.

2

involving members of the Maricopa County Board of Supervisors (the "Board"), judges serving in the Maricopa County Superior Court, and others. These disciplinary proceedings primarily concern Alexander's role in a federal civil racketeering ("RICO") lawsuit filed by Thomas and Maricopa County Sheriff Joseph Arpaio in 2009 against the Board, its members, four superior court judges, and others.

¶4 MCAO and the Sheriff's Office initially considered filing a civil RICO lawsuit against the Board in fall 2009 but seemingly abandoned the idea after several attorneys, including Deputy County Attorney Peter Spaw, MCAO's designated RICO expert, advised against it due to a lack of supporting evidence. Thomas reconsidered without consulting his senior advisors, however, and directed Deputy County Attorney Lisa Aubuchon to pursue the lawsuit.

¶5 On December 1, 2009, Aubuchon filed the RICO lawsuit on behalf of Thomas and Arpaio in their official capacities. She alleged that the defendants committed acts of bribery and extortion as part of a conspiracy to hinder the investigation and prosecution of elected officials, county employees, and their attorneys concerning the funding and construction of a court tower in Maricopa County.

¶6 Days after the lawsuit was filed, Thomas assigned Alexander to the case because Aubuchon had a potential conflict

3

of interest. Alexander had no prior trial experience and only minimal knowledge of RICO. According to Mark Faull, her supervisor for deputy county attorney duties, Alexander incompetently handled routine court matters, and he warned that appointing Alexander as lead counsel in the RICO lawsuit would be "inviting malpractice" as she lacked sufficient experience and training.

¶7 Thomas transferred Alexander to work under Spaw's supervision. MCAO also retained the law firm of Ogletree, Deakins, Nash, Smoak & Stewart ("Ogletree Deakins") to provide "advice, research and review of pleadings" in the RICO lawsuit, but terminated the engagement two weeks later. Deputy County Attorney Jeffrey Duvendack was also initially assigned to assist Alexander but never did so. Although Spaw communicated with opposing counsel and Thomas about the lawsuit and otherwise worked on the matter, only Alexander appeared as counsel of record in the lawsuit after Aubuchon withdrew.

¶8 The RICO defendants filed motions to dismiss the complaint, and Alexander and Spaw drafted and filed responses. While the motions were pending, Alexander and Spaw, with input from Thomas, drafted and filed a first-amended complaint, which added two counts. The court rejected the pleading, concluding MCAO was not entitled to amend the complaint without leave of the court. Alexander moved the court to either reconsider its

4

order or grant plaintiffs leave to file the amended complaint. The court never ruled on this motion or the motions to dismiss. In early March 2010, the court granted the Sheriff's motion to substitute out-of-state counsel for MCAO. One week later, Alexander and the Sheriff's new attorneys filed a notice voluntarily dismissing the complaint.

¶9 Also in March 2010, at the request of the Executive Director of the State Bar of Arizona, Chief Justice Rebecca White Berch appointed independent bar counsel to investigate and, as appropriate, prosecute allegations of ethical misconduct against Thomas and other MCAO lawyers. Pursuant to former Rule 54(b)(4), bar counsel submitted a report of the investigation to a probable cause panelist, who subsequently found probable cause for counsel to file a formal complaint against Thomas, Aubuchon, and Alexander. Bar counsel filed a complaint in February 2011 alleging Alexander violated six ERs during her involvement in the RICO lawsuit and violated former Rule 53(d) and (f) by failing to cooperate and furnish information during the disciplinary screening investigation.[2]

¶10 Because bar counsel filed the complaint after the effective date of the new rules governing disciplinary

---

[2] The complaint also alleged thirty-three charges against Thomas and twenty-eight charges against Aubuchon, which resulted in an order by the hearing panel disbarring them. The panel's findings regarding Thomas and Aubuchon and the discipline imposed are not part of this appeal.

5

complaints, a three-person hearing panel composed of a presiding disciplinary judge, a lawyer volunteer, and a non-lawyer volunteer conducted the disciplinary hearing. Ariz. R. Sup. Ct. 52. After a lengthy evidentiary hearing, the panel issued its report finding that bar counsel had proven all charges against Alexander. It then suspended her from the practice of law for six months and one day. Alexander timely appealed, and enforcement of the panel's suspension order was stayed pending appeal. We have jurisdiction pursuant to Article 3 and Article 6, Sections 1, 5(3), and 5(4) of the Arizona Constitution and Supreme Court Rule 59(a).

## DISCUSSION

### I.   Professional Misconduct

¶11     Alexander argues bar counsel failed to prove the alleged misconduct by clear and convincing evidence. Ariz. R. Sup. Ct. 58(j)(3). Bar counsel satisfied this burden if he showed it was highly probable that the allegations against Alexander were true. *In re Curtis*, 184 Ariz. 256, 261, 908 P.2d 472, 477 (1995). We accept the panel's factual findings unless they are clearly erroneous. Ariz. R. Sup. Ct. 59(*l*). Findings are clearly erroneous if they are not supported by reasonable evidence. *In re Van Dox*, 214 Ariz. 300, 304 ¶ 15, 152 P.3d 1183, 1187 (2007).

6

## A. ER 3.1: Meritorious Claims and Contentions

¶12     ER 3.1 prohibits a lawyer from bringing or defending a proceeding or asserting issues therein "unless there is a good faith basis in law and fact for doing so that is not frivolous, which may include a good faith and nonfrivolous argument for an extension, modification or reversal of existing law."  The hearing panel found that Alexander violated ER 3.1 by maintaining the RICO lawsuit because both the complaint and the proposed amended complaint were legally and factually deficient, and she failed to sufficiently investigate the validity of the RICO allegations.

¶13     We apply an objective standard to assess whether a legal proceeding is frivolous, but we use a subjective standard to determine whether the lawyer acted in good faith.  *In re Levine*, 174 Ariz. 146, 153, 847 P.2d 1093, 1100 (1993).  To warrant suspension, the evidence must demonstrate that the lawyer knowingly violated ER 3.1.  *Id*. at 153–54, 847 P.2d at 1100–01.  A lawyer's motives and knowledge can be inferred from the frivolousness of a claim.  *Id*. at 154, 847 P.2d at 1101 ("[A]n objective standard assumes that a genuinely frivolous claim will be known to be frivolous by most lawyers." (quoting Geoffrey C. Hazard, Jr., & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 331 (student ed. 1986))).

¶14     Alexander does not dispute the panel's finding that the RICO lawsuit was frivolous. Instead, Alexander argues she was unaware the lawsuit was frivolous and acted in good faith by relying on representations of more experienced MCAO lawyers while she conducted a reasonable inquiry regarding the merits of the RICO allegations. Alexander contends she did not know that Spaw and other lawyers had previously advised against filing a RICO lawsuit, she was not involved in filing the initial complaint, she had no reason to doubt representations that MCAO lawyers and detectives had properly investigated the allegations underlying the RICO lawsuit, and she worked under Spaw's supervision.

¶15     The involvement of other lawyers in filing the RICO complaint did not relieve Alexander of her ethical obligation to ensure the RICO lawsuit was supported in law and fact. "What is required of lawyers . . . is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith and nonfrivolous arguments in support of their clients' positions." ER 3.1 cmt. 2. Alexander relies on *Unioil, Inc. v. E.F. Hutton & Co.*, which held that reliance on co-counsel "may in certain circumstances satisfy an attorney's duty of reasonable inquiry" imposed by Federal Rule of Civil Procedure 11. 809 F.2d 548, 558 (9th Cir. 1986), *overruled in part on other grounds*, *Townsend v. Holman*

8

*Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990), *as recognized by In re Keegan Mgmt. Co.*, 78 F.3d 431, 434–35 (9th Cir. 1996). But Alexander ignores *Unioil*'s warning that when relying on another lawyer, "counsel must 'acquire[] knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact,'" and therefore, "[a]n attorney who signs the pleading cannot simply delegate to forwarding co-counsel his duty of reasonable inquiry." *Id.* (citation omitted).

¶16 That Alexander worked under Spaw's supervision similarly did not reduce her responsibilities under ER 3.1. A lawyer remains bound by the Rules of Professional Conduct even when working at another lawyer's direction. ER 5.2(a). We will not find professional misconduct by the subordinate lawyer, however, "if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." ER 5.2(b).

¶17 We accept that when Alexander was first assigned to the RICO lawsuit she reasonably assumed Aubuchon had properly investigated the RICO allegations before filing the complaint. Alexander's compliance with ER 3.1 instead turns on whether she sufficiently informed herself about the applicable facts and law to make good faith and nonfrivolous arguments in maintaining the lawsuit.

¶18 The evidence adduced at the disciplinary hearing

9

supports the panel's finding that Alexander knowingly failed to establish that factual and legal bases existed to continue the RICO lawsuit. Alexander was well aware when she substituted for Aubuchon that the complaint was deficient. Two days before Alexander filed her notice of substitution of counsel, Spaw, whom she relied on as "the senior RICO attorney," sent her an e-mail relating his "deep and profound concern about the viability of [the RICO] action" and advising her that the complaint appeared "legally deficient at every issue" making it "dead-on-arrival." Spaw advised her to draft an entirely new complaint rather than attempt to salvage the existing one. Days later, Spaw told Alexander she needed to "find the investigative file," emphasizing that "without access to the detailed facts supporting this suit," all efforts to "'research' a way out of a dismissal with prejudice" would be "tantamount to simply rearranging the deck chairs on the Titanic." Contemporaneously, a lawyer from Ogletree Deakins told Alexander, Spaw, and Duvendack that the complaint was "weak," particularly as it concerned the judge defendants, and it "would have a real problem even standing up to an initial challenge." Alexander's own research confirmed she needed to "beef up" the complaint with "more details and facts and allegations" in order to avoid dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding complaint must state a claim "plausible on its

face" to avoid dismissal).

¶19    Despite the warnings from other more experienced lawyers and the results of her research, Alexander failed to confirm the existence of any meaningful evidence to support plausible RICO claims.  Alexander testified at the disciplinary hearing that she maintained the RICO lawsuit in good faith by reviewing "hundreds of documents" collected by the MCAO executive division and hearing from "everyone [she] talked to in the office" that judges were trying to stop prosecutions of Board members.  But this review did not enable Alexander to correct the deficiencies in the complaint by alleging specific facts supporting the claims of racketeering activity.  For example, in the proposed amended complaint, Alexander repeated Aubuchon's allegation that defendants conspired to "commit bribery and/or extortion" but did not identify or state any facts plausibly supporting this allegation.  When asked to identify the factual bases for these allegations and others at the disciplinary hearing, Alexander was unable to do so, with one exception,[3] and instead either vaguely repeated that the

_____

[3]    As evidence of defendants' alleged common plan to hinder prosecution, Alexander cited anticipated testimony from lawyer Jack LaSota that Board member Don Stapley had told Maricopa County Superior Court Presiding Judge Barbara Mundell "that if she hired [lawyer] Tom Irvine to represent them, then she would get the Court Tower."  But LaSota testified he did not recall speaking to anyone at MCAO about this statement.  Had he been interviewed, LaSota would have related he had no direct

11

"hundreds of documents" and other prosecutors' "statements" supported the allegations or stated she could not recall the bases. Similarly, when asked what facts substantiated the statement in her response to the motions to dismiss that "[t]he defendants have been able to obstruct Maricopa County law enforcement officers and retaliate against their agencies," Alexander answered she did not recall, despite the seriousness of the allegation and the fact she had authored it less than two years before the hearing. The panel was justified in not accepting Alexander's testimony and finding she never identified plausible evidence to support the RICO claims.

**¶20** The evidence also supports a finding that Alexander knew her factual inquiry was inexcusably deficient. Alexander never obtained Aubuchon's investigative file. As late as one week before plaintiffs voluntarily dismissed the RICO lawsuit, Aubuchon refused to produce the file because the investigative material purportedly related to an ongoing investigation. And Alexander never enlisted the investigative services of either the Sheriff's Office or MCAO's investigation division, never saw a police report concerning allegations of criminal activity, and, despite the then-recent nature of events, could not recall

knowledge of such a conversation but had heard it as a "rumor" and "gossip." Alexander's belief about LaSota's anticipated testimony did not show she had identified a factual basis for her allegation of a common plan.

12

at the disciplinary hearing whether she ever located anyone familiar with an investigation of the RICO allegations.

¶21 Although Alexander could not identify any facts to plausibly support the RICO lawsuit and knew the complaint was, in Spaw's words, "dead on arrival," she nevertheless filed an opposition to its dismissal. And because Alexander knew the lawsuit was frivolous, she cannot escape responsibility for her misconduct by blaming Spaw. ER 5.2 cmt. 1 ("[I]f a subordinate filed a frivolous pleading at the direction of a supervisor, the subordinate would not be guilty of a professional violation unless the subordinate knew of the document's frivolous character."); *see also id.* cmt. 2 ("When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment. . . . [But] [i]f the question can reasonably be answered only one way, the duty of both lawyers is clear and they are equally responsible for fulfilling it."). For all these reasons, the panel was justified in finding that Alexander knowingly maintained a frivolous lawsuit in violation of ER 3.1.

## B. ER 4.4(a): Respect for Rights of Others

¶22 The hearing panel found that Alexander violated ER 4.4(a), which prohibits lawyers in the course of representing clients from "us[ing] means that have no substantial purpose

13

other than to embarrass, delay, or burden any other person." Specifically, the panel concluded that Alexander's failure to specify evidence of racketeering, bribery, or any other crime in the proposed amended complaint demonstrated she pursued the lawsuit as "political payback" for Thomas.

¶23      To determine whether Alexander's means in representing Thomas and Arpaio had a substantial purpose other than embarrassing, delaying, or burdening the RICO defendants, we examine her motives. *In re Levine*, 174 Ariz. at 154, 847 P.2d at 1101. In doing so, we consider Alexander's subjective perspective, but we ultimately apply an objective standard to determine whether she violated ER 4.4(a). *Id.* As the Kansas Supreme Court reasoned in addressing Kansas' counterpart to ER 4.4(a), "[a] lawyer cannot escape responsibility for a violation based on his or her naked assertion that, in fact, the 'substantial purpose' of conduct was not to 'embarrass, delay, or burden' when an objective evaluation of the conduct would lead a reasonable person to conclude otherwise." *In re Comfort*, 159 P.3d 1011, 1020 (Kan. 2007).

¶24      Bar counsel argues that he proved the violation by showing the lack of any legal or factual basis for the RICO lawsuit and that Alexander was "adamant" the suit continue. It does not necessarily follow from these facts, however, that Alexander was motivated to pursue the RICO lawsuit as a means of

14

"political payback." Whatever Thomas's and Aubuchon's motives for pursuing the RICO lawsuit may have been, they cannot be attributed to Alexander without evidence she shared them. But no evidence showed Alexander had any involvement in the disputes between MCAO and the RICO defendants or that she was personally affected by any defendant's alleged misdeeds.[4] She did not serve as one of Thomas's senior advisors, she was not involved in the decision to initiate the lawsuit, and she did not ask to be assigned to the case. At most, the evidence showed Alexander was motivated to pursue the RICO lawsuit in order to please Thomas, thereby furthering her career at MCAO. For these reasons, we reject the panel's finding that Alexander violated ER 4.4(a).

### C. ER 1.1: Competence

¶25 The hearing panel found that Alexander violated ER 1.1, which requires a lawyer to "provide competent representation to a client" by employing "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The panel relied on expert testimony that the

---

[4] In 2007, at Thomas's request, Alexander compiled a list of "comments by judges critical of [Thomas] and [MCAO] office policies." Although this task undoubtedly informed Alexander of Thomas's concern about what judges communicated about him, it did not involve her in any such disputes or provide a basis to infer that she bore any grudges. Consequently, we reject bar counsel's contention that Alexander's performance of this assignment evidenced a motive two years later to burden or embarrass some of the listed judges in the RICO lawsuit.

15

RICO complaint and proposed amended complaint did not meet minimal standards and the fact that Alexander, in responding to motions to dismiss, asked the district court to act outside its adjudicative role by advising how RICO law could be changed to prospectively avoid dismissals of similar lawsuits. Alexander does not contest that the complaint and proposed amended complaint were deficient but argues she nevertheless provided ethically competent representation by educating herself about RICO issues while working at the direction of Spaw and other more experienced lawyers. Bar counsel counters that she violated ER 1.1 because she maintained a fatally defective lawsuit.

¶26 A lawyer's negligence in handling a matter does not necessarily constitute a violation of ER 1.1. *In re Curtis*, 184 Ariz. at 261, 908 P.2d at 477. A lawyer crosses the line between negligence and unethical incompetence by failing to possess or acquire the legal knowledge and skill necessary for the representation or by neglecting to investigate the facts and law as required to represent the client's interests. *See id.* at 262, 908 P.2d at 478; *see also* ER 1.1 cmts. 1–2, 4–5. In deciding whether a lawyer violated ER 1.1, "[t]he focus is not on whether a lawyer may have neglected a particular task, but rather whether his or her representation in the 'broader context of the representation' reflects the knowledge, skill,

16

thoroughness, and preparation that the rule requires." *In re Obert*, 282 P.3d 825, 837–38 (Or. 2012) (quoting *In re Magar*, 66 P.3d 1014, 1022 (Or. 2003)). We employ an objective standard to assess competent representation. *Id*. at 837.

**¶27** The evidence supports the panel's finding that Alexander violated ER 1.1. First, Alexander lacked the legal knowledge and skill to represent Thomas and Arpaio in the RICO lawsuit. When she substituted as counsel for Aubuchon, Alexander had minimal litigation experience and had never tried a case. ER 1.1 cmt. 1 (noting that factors used to determine requisite knowledge and skill "include the relative complexity and specialized nature of the matter" and "the lawyers' general experience"). In the years preceding her representation in the RICO lawsuit, Alexander's duties primarily involved non-litigation-related tasks such as serving on a MCAO grant committee, acting as MCAO's social media liaison, and making community presentations. And according to Faull, Alexander's performance of basic court coverage duties was deficient. In sum, Alexander was not sufficiently skilled to represent Thomas and Arpaio in a civil RICO lawsuit, which, according to an expert witness, typically involves "amazingly complex" issues that challenge even seasoned lawyers.

**¶28** Alexander correctly contends that a lawyer can acquire competence through study and association with more

17

experienced lawyers. *See id.* cmt. 2 ("A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question."), cmt. 4 ("A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation."). But the record belies Alexander's contention that she attained competence in this manner. When Alexander substituted as counsel, one defendant had already moved to dismiss the complaint and other defendants quickly followed. Alexander had insufficient time to educate herself about RICO to enable her to competently assess the viability of the complaint, draft an amended complaint, and respond to the motions. And although Alexander initially thought she would receive assistance from experienced RICO counsel, that expectation quickly vanished. Spaw immediately informed her that he had little experience with federal RICO lawsuits and she likely had a better sense of the relevant facts and law than he did. Ogletree Deakins' services were terminated after two weeks, and Duvendack never assisted Alexander. The best evidence of Alexander's lack of legal skill and knowledge and her inability to sufficiently attain competency through study and association with other lawyers is her defense of the legally deficient complaint and her proposed amended complaint,

18

which was likewise legally deficient.

**¶29**　　　Second, for the reasons previously explained, *see supra* ¶¶ 18–21, Alexander violated ER 1.1 by failing to sufficiently investigate the factual and legal bases for the RICO lawsuit.　*See* ER 1.1 cmt. 5 ("Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation.").

**¶30**　　　We reaffirm that a lawyer's negligence does not necessarily constitute a violation of ER 1.1.　*In re Curtis*, 184 Ariz. at 261, 908 P.2d at 477.　But considering Alexander's responsibilities in a complex RICO lawsuit relative to her limited legal experience and insufficient preparation, we agree with the panel she violated ER 1.1.　Although we can appreciate Alexander's apparent desire to fulfill Thomas's assignment, she was ethically required to assess her legal skill level and refuse the assignment as beyond her capabilities.

### D.　ER 1.7:　Conflict of Interest:　Current Clients

**¶31**　　　ER 1.7(a)(1) prohibits a lawyer from representing one client directly adverse to another client.　The panel found that Alexander violated ER 1.7(a)(1) by suing the Board while her office simultaneously served as the Board's lawyer.　Alexander argues this finding is erroneous because the Board had fired

19

MCAO as its lawyer before the RICO lawsuit was filed.

¶32    In December 2008, the Board declared that MCAO had a conflict of interest representing the Board due to ongoing disputes. Consequently, the Board retained private counsel to advise it, created its own "General Litigation Department," and refused to send new civil litigation matters, except tax cases, to MCAO's civil division. MCAO disputed the legality of the Board's action and filed an action seeking declaratory relief. Because the Board-declared conflict was pending when Alexander maintained the RICO lawsuit, she argues she did not simultaneously act as the Board's lawyer and therefore did not violate ER 1.7(a)(1).

¶33    Unquestionably, the lawyer-client relationship between MCAO and the Board continued during the life of the RICO lawsuit. First, A.R.S. § 11-532(A)(9) required MCAO to act as the Board's legal advisor and represent it in civil disputes.[5] *Cf. Bd. of Supervisors of Maricopa Cnty. v. Woodall*, 120 Ariz. 379, 382, 586 P.2d 628, 631 (1978) (holding that a board of supervisors lacks ability to retain outside counsel to perform a county attorney's duties unless the county attorney refuses to

---

[5]    Our court of appeals, relying on A.R.S. § 11-532(A)(9) and *Board of Supervisors of Maricopa County v. Woodall*, 120 Ariz. 379, 586 P.2d 628 (1978), ultimately held that the Board lacked authority to retain non-MCAO lawyers to advise and represent the Board except under certain circumstances and on a case-by-case basis. *Romley v. Daughton*, 225 Ariz. 521, 527 ¶¶ 28-29, 241 P.3d 518, 524 (App. 2010).

act, is incapable of doing so, or is unavailable). Alexander effectively acknowledged the continuing lawyer-client relationship by alleging in the proposed amended complaint that the Board had "unlawfully usurped plaintiff Thomas's authority to serve as legal counsel to the Board and to defend Maricopa County in civil actions." Second, even if the Board's actions were lawful, MCAO continued to represent the Board on tax matters and the Board only referred new civil cases to its General Litigation Department, presumably leaving pending cases with MCAO. In sum, MCAO and the Board had an existing lawyer-client relationship during the RICO lawsuit, and Alexander violated ER 1.7(a)(1) by perpetuating the RICO lawsuit against the Board.

¶34 The panel also found that Alexander violated ER 1.7(a)(2), which prohibits a lawyer from representing a client if "there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." The panel determined that Alexander violated this rule because her judgment was limited by "self-interest and personal animosity." For the reasons previously explained, *see supra* ¶ 24, the evidence does not reflect that Alexander pursued the RICO lawsuit for reasons of personal animus or self-interest.

¶35 Bar counsel nevertheless argues that the panel properly imputed Thomas's personal interests to Alexander

21

pursuant to ER 1.10(a), which prohibits a lawyer from representing a client when another lawyer in the firm would be prohibited from doing so due to a conflict of interest. A conflict of interest based on the prohibited lawyer's personal interests, however, will not be imputed unless a significant risk exists that the associated lawyer's representation would be materially limited. ER 1.10(a). The lawyer's representation is "materially limited" if the prohibited lawyer's personal interests would adversely affect the associated lawyer's loyalty to the client or threaten the confidentiality of information. *Id.* cmt. 3 ("The rule in paragraph (a) does not prohibit representation where neither questions of client loyalty nor protection of confidential information are presented."). Bar counsel does not explain how Thomas's animosity towards the RICO defendants threatened either Alexander's loyalty to Thomas and Arpaio or confidential information, and the record does not reveal such a threat. We therefore reject the panel's finding that Alexander violated ER 1.7(a)(2).

**E. ER 3.4(c): Fairness to Opposing Party and Counsel**

¶36 The panel found that Alexander violated ER 3.4(c) by basing the RICO lawsuit in part on allegations that some defendants had initiated bar complaints against Thomas and other MCAO lawyers, even though Rule 48(*l*) prohibits civil lawsuits against bar complainants. ER 3.4(c) prohibits a lawyer from

22

"knowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." Although Alexander raises multiple challenges to the panel's finding, the dispositive issue is whether she "knowingly" violated Rule 48(*l*).

¶37 Alexander "knowingly" violated Rule 48(*l*) only if she had actual knowledge of the rule when she maintained the RICO lawsuit. ER 1.0(f) (defining "knowingly" as "actual knowledge of the fact in question"). A showing that Alexander should have known her conduct violated Rule 48(*l*) is insufficient to prove a violation of ER 3.4(c). *In re Tocco*, 194 Ariz. 453, 457 ¶ 11, 984 P.2d 539, 543 (1999).

¶38 The record does not contain clear and convincing evidence that Alexander knowingly violated Rule 48(*l*). Alexander was not asked at the hearing about her awareness of Rule 48(*l*), and she testified she could not recall researching "the nature of immunity provided to complainants in Bar proceedings" before filing the proposed amended complaint. The motions to dismiss the complaint argued that defendants were immune from civil liability for initiating bar complaints, but none cited Rule 48(*l*) or cases relying on that rule. Although Alexander may have been negligent by maintaining the RICO lawsuit in ignorance of Rule 48(*l*), no evidence establishes she actually knew of her violation. We therefore reject the panel's

23

finding that Alexander violated ER 3.4(c).

### F.   ER 8.4(d):   Misconduct

**¶39**     ER 8.4(d) provides "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."   The panel found that Alexander violated this ER by maintaining the RICO lawsuit against the judges, who were absolutely immune from civil damages lawsuits. According to the panel, Alexander, along with Thomas and Aubuchon, "pursued the RICO action to retaliate against the named judges and to intimidate the judges of the Superior Court," thereby prejudicing the administration of justice.

**¶40**     Alexander argues the panel erred because no evidence suggests she intended to retaliate against or intimidate judges. But ER 8.4(d) does not require a mental state other than negligence.   *In re Clark*, 207 Ariz. 414, 418 ¶ 16, 87 P.3d 827, 831 (2004).   Consequently, for purposes of assessing a violation of ER 8.4(d), Alexander's motives in maintaining the RICO lawsuit are immaterial.

**¶41**     Alexander also contends the panel erred because it was debatable whether the defendant judges were immune from civil liability.   We disagree.   Judges are absolutely immune from civil damages lawsuits based on judicial acts taken within their subject matter jurisdiction, "even when the judge is accused of acting maliciously and corruptly."   *Piersen v. Ray*, 386 U.S.

24

547, 554 (1967); *accord Stump v. Sparkman*, 435 U.S. 349, 356 (1978); *Acevedo v. Pima Cnty. Adult Prob. Dep't*, 142 Ariz. 319, 321, 690 P.2d 38, 40 (1984).[6] A judge loses that immunity only when acting in a non-judicial capacity or in "complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991); *see also Acevedo*, 142 Ariz. at 321, 690 P.2d at 40 ("[Judges] are not liable in a civil action for damages for their judicial acts, even when such acts are in excess of their jurisdiction or are alleged to have been done maliciously or corruptly.").

¶42 Alexander unquestionably maintained the RICO lawsuit against the judges for judicial acts taken in criminal cases over which the judges had subject matter jurisdiction. For example, the complaint and proposed amended complaint alleged as racketeering acts that one judge ignored state law in quashing a grand jury subpoena and in disqualifying MCAO from investigating court tower project expenditures, and another judge wrongly failed to recuse himself from presiding over a criminal case and then issued an improper ruling. Alexander's response to the

---

[6] Alexander argues she presented authority in her response to the motions to dismiss that the judges were not immune from the RICO lawsuit. The cases cited by Alexander did not support her position because they either involved a claim for injunctive relief rather than civil damages, *Pulliam v. Allen*, 466 U.S. 522, 524 (1984), or concerned criminal RICO charges, *United States v. Maloney*, 71 F.3d 645, 649 (7th Cir. 1995); *United States v. Grubb*, 11 F.3d 426, 430 (4th Cir. 1993).

motions to dismiss the complaint highlighted that the RICO claims against the judges stemmed from their rulings: "Defendant judges willfully acted unlawfully by ignoring the law and issuing rulings shielding themselves and other defendants from investigation and prosecution." The judges' rulings constituted judicial acts, as they were acts typically performed by judges and involved cases. *See Ashelman v. Pop*e, 793 F.2d 1072, 1075–76 (9th Cir. 1986) (listing factors relevant in deciding whether an act is judicial, including whether it is a function normally performed by a judge and relates to a case). Consequently, the defendant judges were immune from the claims alleged in the RICO lawsuit.

**¶43** Alexander finally argues that because the judges only testified they were adversely affected by the *filing* of the RICO lawsuit, *maintaining* the lawsuit did not prejudice the administration of justice. We readily reject this argument. A violation of ER 8.4(d) turns on whether a lawyer's conduct prejudiced the administration of justice rather than the particular persons affected. Judicial immunity from civil damages lawsuits exists to assure that judges will perform judicial functions independently and without fear of personal consequences, thereby facilitating the proper administration of justice. *See Stump*, 435 U.S. at 355–56 ("As early as 1872, the Court recognized that it was 'a general principle of the highest

26

importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself.'" (alteration in original) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). Alexander impeded the administration of justice by demonstrating to all judges in Maricopa County that they risked having to defend against a civil damages lawsuit if they made rulings that displeased MCAO. We agree with the panel that Alexander violated ER 8.4(d) by maintaining the RICO lawsuit against the defendant judges.

### G. Former Rule 53: Failure to Cooperate

**¶44** The panel found that Alexander failed to promptly respond to bar counsel's screening investigation letter and instead filed numerous "meritless, frivolous and dilatory motions, replies, and special actions" with the probable cause panelist and this Court in an effort to "delay, obstruct and burden" the screening investigation. According to the panel, Alexander's conduct justified application of former Rule 53, which authorized discipline against any lawyer who failed to either cooperate with state bar officials and staff performing their duties, or promptly furnish a full and complete response

to bar counsel's inquiry. Ariz. R. Sup. Ct. 53(d), (f) (2010).[7] Alexander does not contest that her filings were "meritless, frivolous and dilatory" and designed to "delay, obstruct and burden" the investigation; we therefore accept those findings. Instead, she argues that because she justifiably relied on her lawyers to properly respond to the screening investigation letter, she cannot be disciplined under former Rule 53 for their actions. She alternately contends that discipline under this rule is not warranted because her lawyers ultimately provided a comprehensive response to the screening investigation letter.

¶45        Alexander did not insulate herself from application of former Rule 53 by retaining lawyers to represent her in the investigation process. We agree with the holding of the Kansas Supreme Court, which addressed application of Kansas' equivalent to former Rule 53 in a similar situation:

> A respondent who retains an attorney to represent him or her in a disciplinary proceeding is not relieved of the responsibilities . . . to cooperate with and provide information to the Disciplinary Administrator. . . . Retained counsel must comply with those duties just as thoroughly as if respondent is communicating directly with the Disciplinary Administrator's office. . . . [R]ules violations by a retained attorney may be imputed to the respondent unless the respondent demonstrates he or she could not reasonably know that retained counsel was obstructing the investigation.

*In re Doudin*, 249 P.3d 1190, 1198–99 (Kan. 2011).

---

[7]     The substance of former Rule 53(d) and (f) is now set forth in Rule 54(d).

28

**¶46** Alexander knew her lawyers were obstructing the investigation. Bar counsel sent Alexander's lawyers a screening investigation letter on April 13, 2010, advising of the misconduct allegations against Alexander, requesting a written response within twenty days, and unequivocally reminding them of Alexander's ethical obligation to cooperate in the investigation. Rather than comply with this request, the lawyers filed five motions with the probable cause panelist over the course of the next month, all seeking to stop, delay, or otherwise burden the investigation. After the probable cause panelist denied the motions, Alexander's lawyers challenged the ruling by filing three special action petitions with this Court, which we declined to consider. Alexander expressly permitted her lawyers to file all these documents. The panel did not err, therefore, by holding her responsible for her lawyers' efforts to burden the investigation.

**¶47** We also reject Alexander's assertion that she complied with former Rule 53 by ultimately providing a comprehensive written response to bar counsel's screening investigation letter. The response was not "prompt," as Alexander's lawyers sent it more than two months after the date requested by bar counsel. *See* Ariz. R. Sup. Ct. 53(f) (2010). Consequently, regardless of the comprehensive nature of Alexander's response to the screening letter, it came too late to satisfy her

29

obligation to "promptly" respond.  We agree with the panel that discipline was warranted under former Rule 53.

## II.  Sanction Imposed

¶48     Alexander alternately argues the panel erred by suspending her from the practice of law for six months and one day.  She contends that reprimand or censure is the appropriate sanction.  We review the imposed sanction de novo as a question of law.  *In re Phillips*, 226 Ariz. 112, 117 ¶ 27, 244 P.3d 549, 554 (2010).  Although we consider the panel's view, we do not defer to it because we are ultimately responsible for deciding the appropriate sanction.  *Id.*

¶49     We determine suitable disciplinary sanctions in conjunction with the American Bar Association's *Standards for Imposing Lawyer Sanctions* ("Standards") and, when appropriate, a proportionality analysis.  Ariz. R. Sup. Ct. 58(k).  The sanction imposed, however, is tailored to the unique circumstances of the case.  *In re Wolfram*, 174 Ariz. 49, 59, 847 P.2d 94, 104 (1993).  Standard 3.0 lists four factors for courts to examine in deciding an appropriate sanction:  "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors."  Alexander's challenge on appeal focuses on factors (b)–(d).

¶50     The  Standards  provide  presumptive  sanctions  for

30

misconduct that depend on the lawyer's mental state when violating a particular duty and the resulting injury or potential injury. After the presumptive sanction is identified, the Court considers any aggravating and mitigating factors to determine the appropriate sanction. Standards, Preface, § I(B). The Standards do not account for multiple findings of misconduct but suggest that, at a minimum, the imposed sanction align with the sanction for the most serious finding. Standards, Theoretical Framework, § II.

### A. Duty

¶51 Alexander's most serious misconduct was maintaining the RICO lawsuit while knowing it lacked legal and factual merit, thereby violating duties she owed the public and the legal system. *See* Standards 5.0, 6.0. We recognize that Alexander's most important ethical duty was the one owed her clients. *See* Standards, Theoretical Framework, § II ("In determining the nature of the ethical duty violated, the standards assume that the most important ethical duties are those obligations which a lawyer owes to clients."). Although she maintained the lawsuit against the Board knowing MCAO was statutorily required to represent the Board in civil matters, *see supra* ¶ 33, her maintenance of the unfounded RICO lawsuit was the more serious misconduct because it resulted in more injury and potential injury to the public and the legal system

31

than the Board suffered as a result of being sued by its own lawyers. Consequently, Standard 5.2, applicable to cases involving public officials who prejudice the administration of justice, and Standard 6.2, applicable to cases involving non-meritorious claims, guide our analysis.

### B. Mental State

**¶52** Alexander's mental state when she violated her duties to the public and the legal system affects the presumptive sanction. *In re Phillips*, 226 Ariz. at 117–18 ¶ 31, 244 P.3d at 554–55. Not surprisingly, the Standards recommend more severe sanctions for intentional or knowing misconduct than negligent misconduct, which threatens less harm. *Id*. at 118 ¶ 31, 244 P.3d at 555.

**¶53** The hearing panel found that Alexander acted knowingly by maintaining the RICO lawsuit without a factual or legal basis. Alexander disputes the panel's finding, arguing she acted negligently, at most, because she relied on the expertise of supervising and senior lawyers at MCAO in concluding that the RICO lawsuit was well founded. For the reasons previously explained in discussing Alexander's violation of ER 3.1, *see supra* ¶¶ 12–21, we reject her argument. The panel properly found that Alexander maintained the RICO lawsuit while knowing it lacked a legal or factual basis.

### C. Potential or Actual Injury

¶54       Standards 5.22 and 6.22 each provide that suspension is presumptively warranted if the lawyer's knowing misconduct injures or potentially injures a party. Standard 5.22 additionally states that suspension is warranted if the misconduct injures or potentially injures "the integrity of the legal process." The panel determined that Alexander's maintenance of the RICO lawsuit caused serious injury to both the RICO defendants and the legal process.

¶55       Alexander again asserts that because the RICO defendants testified they were harmed by the filing of the lawsuit rather than its maintenance, she did not injure them. Alexander splits too fine a hair. No RICO defendant testified he or she suffered injury solely from Aubuchon's act of filing the lawsuit. And common sense tells us that as the RICO lawsuit lingered with attendant public scrutiny, the defendants experienced increased levels of distress. All the RICO defendants testified about the emotional upheaval and anxiety caused by the lawsuit. One lawyer defendant, for example, described the harm to his business relationships, reputation, and family as a result of being accused of bribing a judge and added that his law firm spent approximately $300,000 to defend the RICO lawsuit. A judge defendant testified he was impacted emotionally by both the RICO lawsuit and companion criminal

33

charges, became "severely depressed," and had to "battle through it" with the support of family and colleagues. Had Alexander voluntarily dismissed the RICO lawsuit instead of defending it, defendants' injuries could have been minimized.

¶56 Alexander briefly argues the panel erred because the evidence did not demonstrate how her misconduct caused injury or potential injury to the integrity of the legal process. As previously explained, *see supra* ¶ 43, Alexander's misconduct prejudiced the administration of justice by improperly threatening civil damages against judges for their judicial acts. Indeed, one judge defendant testified that the lawsuit caused her to retire to avoid the possibility that her continued role on the bench would "smear[] [her] colleagues, the institution, where the public must have trust and confidence in order for courts to operate appropriately." Ample evidence supports the panel's finding that Alexander's misconduct injured the legal process.

### D. Aggravating and Mitigating Factors

¶57 Because Alexander engaged in knowing misconduct that injured the RICO defendants and the legal process, the presumptive sanction in this case is suspension. *See* Standards 5.22, 6.22. The sanction to be imposed, however, requires consideration of any pertinent aggravating and mitigating factors. *See* Standard 9.1.

34

**¶58** Referring to aggravating factors listed in ABA Standard 9.0, and without elaboration, the panel found the existence of four factors: (1) "pattern of misconduct" (9.22(c)); (2) "multiple offenses" (9.22(d)); (3) "bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency" (9.22(e)); and (4) "refusal to acknowledge wrongful nature of conduct" (9.22(g)). It found one mitigating factor: "absence of a prior disciplinary record" (9.32(a)). Alexander challenges the findings of all aggravating factors. Aggravating factors need only be supported by reasonable evidence. *In re Abrams*, 227 Ariz. 248, 252 ¶ 27, 257 P.3d 167, 171 (2011).

**¶59** Alexander disputes she committed multiple offenses or obstructed the disciplinary process but offers no arguments not previously rejected. The panel correctly found those aggravating factors.

**¶60** Alexander also asserts she acknowledged the wrongful nature of her conduct by testifying that she might have proceeded differently had she been aware of all pertinent information. This lukewarm speculation is a far cry from a sincere expression of remorse. Other testimony from Alexander is more revealing:

> Q. Now, in your deposition, I asked you if you had any remorse for your conduct in the racketeering case. Do you recall that question?

35

A. Vaguely.

Q. Do you recall – and I'm going to paraphrase – your answer was, "only that you are in this proceeding was your only remorse." Do you recall that answer?

A. That doesn't sound completely, but it's something like that.

And while the disciplinary hearing was ongoing, Alexander posted to her personal website and published on her Twitter account another person's column describing the disciplinary proceedings as "nothing but a trumped-up, meritless witch hunt" that unfairly targeted Alexander for her conservative views. Reasonable evidence supports the panel's finding that Alexander is not remorseful.

**¶61** We agree with Alexander, however, that reasonable evidence does not support the panel's finding that she had a pattern of misconduct. Commission of multiple offenses does not necessarily equate to a "pattern of misconduct." This Court has found patterns when a lawyer had a prior disciplinary record concerning similar misconduct, and a lawyer engaged in misconduct involving multiple parties in different matters that often occurred over an extended period of time. *See, e.g., id.* ¶¶ 25, 28 (judge pursued sexual relationships with lawyers appearing before him over significant period of time); *In re Zawada*, 208 Ariz. 232, 238 ¶ 20 & n.3, 92 P.3d 862, 868 & n.3 (2004) (prosecutor committed same type of misconduct in two

36

cases separated by years); *In re Hirschfeld*, 192 Ariz. 40, 41 ¶ 2, 44 ¶ 18, 960 P.2d 640, 641, 644 (1998) (lawyer had past history of discipline and committed misconduct involving multiple clients in multiple cases); *see also In re Levine*, 174 Ariz. at 171–72, 847 P.2d at 1118–19 (collecting cases). These cases demonstrate that the "pattern of misconduct" aggravator applies to lawyers who repeatedly engage in ethical misconduct in different contexts. Here, except for her actions in the disciplinary process, Alexander's misconduct arose from her actions in a single matter, involved the same people, and spanned approximately ninety days. And she has no prior disciplinary record. Under these circumstances, Alexander did not engage in a pattern of misconduct.

## E.  Proportionality Review

**¶62**     The panel did not perform a proportionality analysis, and neither Alexander nor bar counsel presents us with other disciplinary cases for purposes of comparison. The unique circumstance of a deputy county attorney pursuing judges, elected officials, a client, and others for civil racketeering damages in a high-profile case makes it difficult to make comparisons to ensure Alexander's sanction fits her misconduct. *Cf. In re Phillips*, 226 Ariz. at 118–19 ¶ 37, 244 P.3d at 555–56 (finding that proportionality review "provide[d] little guidance"). We are not aware of any comparable cases.

37

Consequently, the sanction imposed on Alexander must be tailored to the unique circumstances of this case. *See In re Levine*, 174 Ariz. at 175, 847 P.2d at 1122 ("We have found no case with misconduct of the unusual nature of this case, so we must tailor the discipline to these unique facts, rather than base the sanction on any comparison of how we have disciplined similar misconduct.").

### F. Appropriate Sanction

¶63 In setting the appropriate sanction, we bear in mind that the primary objectives of lawyer discipline are "(1) to protect the public and the courts and (2) to deter the [disciplined] attorney and others from engaging in the same or similar misconduct." *In re Zawada*, 208 Ariz. at 236 ¶ 12, 92 P.3d at 866. Fulfilling these objectives promotes confidence in the integrity of the disciplinary process. *Id.* The sanction is not intended to punish the disciplined lawyer, *In re Alcorn*, 202 Ariz. 62, 74 ¶ 41, 41 P.3d 600, 612 (2002), although it may have that effect.

¶64 After considering the aggravating and mitigating factors, we conclude that the presumptive sanction of suspension is warranted. We are not convinced, however, that Alexander should be suspended for six months and one day. The consequence of the additional day is that Alexander must complete a more onerous reinstatement process and demonstrate her rehabilitation

38

before reinstatement to the active practice of law, which may significantly extend the effective length of her suspension.[8] Ariz. R. Sup. Ct. 64(e)(1); *see also In re Phillips*, 226 Ariz. at 119-20 ¶ 40, 244 P.3d at 556-57. If Alexander is suspended for six months or less, she can apply for reinstatement in a less time-consuming process that does not require a demonstration of rehabilitation. Ariz. R. Sup. Ct. 64(e)(2)(A).

**¶65** Requiring Alexander to complete the more rigorous application-for-reinstatement process is not necessary to achieve the objectives of lawyer discipline.[9] A suspension of six months or less, with its attendant loss of income and professional standing, would protect the public by deterring Alexander and others from engaging in similar misconduct. Alexander has no prior disciplinary record, and, although her misconduct caused significant injury to the RICO defendants, the public, and our system of justice, we do not discern any evidence that her misconduct requires her to affirmatively

---

[8] An applicant for reinstatement must provide, among other things, financial information, describe rehabilitation efforts, and demonstrate at a hearing that the applicant has rehabilitated, complied with all applicable orders and rules, and is fit and competent to practice law. Ariz. R. Sup. Ct. 65(a)(1), (b)(2). After issuance of the hearing panel's recommendation, this Court determines the applicant's fitness for reinstatement. Ariz. R. Sup. Ct. 65(b)(4).

[9] Notably, bar counsel proposed a three-month suspension for Alexander in his proposed report and order submitted to the panel.

demonstrate rehabilitation before reinstatement. For example, no evidence suggests she acted dishonestly, continued a pattern of misconduct, abandoned a client, proceeded under the influence of illness or chemical dependency, or was motivated by malice, greed, or other morally deficient reason. *Cf. In re Zawada*, 208 Ariz. at 235 ¶ 6, 238 ¶ 20, 241 ¶ 38, 92 P.3d at 865, 868, 871 (increasing suspension from six months to six months and one day for prosecutor who intentionally deprived defendants of fair trials in two cases); *In re Moak,* 205 Ariz. 351, 355-56 ¶¶ 25-26, 359 ¶ 46, 71 P.3d 343, 347-48, 351 (2003) (altering suspension from six months to greater than six months for lawyer who withheld evidence in civil case and knowingly misled jury); *In re Riches*, 179 Ariz. 212, 215, 877 P.2d 785, 788 (1994) (determining three-year suspension appropriate for mentally impaired lawyer who stole money from law firm); *In re Kobashi*, 177 Ariz. 584, 585-86, 870 P.2d 402, 403-04 (1994) (imposing suspension greater than six months for lawyer who failed to file lawsuit for injured client before expiration of statute of limitations and then failed to communicate with or return personal documents to client, and failed to appear in disciplinary proceedings). If the State Bar questions whether Alexander should be allowed to resume practice after her suspension, it may object to her application for reinstatement, thereby submitting the matter to the presiding disciplinary

40

judge, and potentially this Court, for review.  Ariz. R. Sup. Ct. 64(e)(2)(B).

**¶66**     A six-month suspension is the appropriate sanction here.  Standard 2.3 advises that a suspension term should be at least six months.  In light of the harm inflicted by Alexander's misconduct, we are not inclined to deviate from the Standard. *Cf. In re Alcorn*, 202 Ariz. at 71 ¶¶ 32-33, 76 ¶ 51, 41 P.3d at 609, 614 (ordering six months' suspension for lawyer who failed to reveal a secret agreement to court that resulted in a "sham" trial); *In re Levine*, 174 Ariz. at 149, 176, 847 P.2d at 1096, 1123 (imposing six months' suspension on lawyer who filed numerous frivolous lawsuits against former law partner and others with no purpose but to embarrass, delay, or burden others).

## CONCLUSION

**¶67**     Alexander committed professional misconduct by violating ERs 1.1, 1.7(a)(1), 3.1, and 8.4(d) and former Rule 53(d) and (f).  We reject the panel's determination that she also violated ERs 1.7(a)(2), 3.4(c) and 4.4(a).  We reduce her suspension of six months and one day to six months, effective thirty days from the filing date of this opinion.  *See* Ariz. R. Sup. Ct. 72(d).  We further require Alexander to attend, during her suspension, at least ten hours of education classes focusing on the ethical responsibilities of Arizona lawyers.  She must

41

submit proof of attendance and her notes from the classes with any affidavit for reinstatement to the practice of law. Alexander must attend these classes in addition to her annual continuing legal education obligation.


_____
                        Ann A. Scott Timmer, Justice
CONCURRING:


_____
Scott Bales, Vice Chief Justice


_____
John Pelander, Justice


_____
Robert M. Brutinel, Justice


_____
Lawrence F. Winthrop, Judge*



    *Chief Justice Rebecca White Berch has recused herself from this case.  Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Lawrence F. Winthrop, Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.